SALEM CAPITAL FLOUR MILLS CO. *v.* STAYTON WATER-DITCH & CANAL CO.

*(Circuit Court, D. Oregon. December 19, 1887.)*

1. WATERS AND WATER-COURSES—INCORPORATION OF MANUFACTURING COMPANY —WATER PRIVILEGES OF.
   The act of December 17, 1856, (Sess. Laws, 47,) declaring certain persons and their associates to be a corporation by the name of the "Wallamet Woolen Manufacturing Company," for the purpose of creating and improving water-powers and privileges and manufacturing, conferred on said corporation the power to dispose of the whole or any part of the "privilege" therein granted, to take and conduct water from the Santiam river at or near Salem, and the "hydraulic power" thereby created.

2. TRUSTS—CREATION OF—DESIGNATION OF CESTUI QUE TRUST.
   A trust estate may be created without a *cestui que trust* in existence, so that one is named in the trust, and comes into being, and may be distinguished during the life of the trustee.[1]

[1] Respecting the question as to the designation of beneficiaries affecting the validity of a trust, see Isaacs v. Emory, (Md.) 1 Atl. Rep. 713; Ireland v. Geraghty, 15 Fed. Rep. 35; Sleeper v. Iselin, (Iowa,) 17 N. W. Rep. 922; Boardman v. Willard, (Iowa,) 34 N. W. Rep. 487.

3. WATERS AND WATER-COURSES — GRANT OF WATER PRIVILEGES — CONSTRUC-
TION.

P. and wife. for a valuable consideration, granted W., W. and R., to the use of the Wallamet Woolen Manufacturing Company "alone," the right to take water from the Santiam anywhere on their donation, and to cut and maintain a canal over and upon said donation capable of carrying sufficient water from said river for the purposes of said company at Salem. *Held*, (1) that under the act of 1854, regulating conveyances, (2 Laws Or. § 3005,) the duration of the easement granted depends on the intent of the parties, and the estate of the grantor in the land burdened therewith, both of which show that the easement was granted in fee-simple, and is perpetual and assignable with the dominant estate or land in connection with which it is used; (2) that the word "alone" only signifies that the grant was made for the *sole* use or benefit of the company, and not the trustees or other person; (3) that the grantee of the easement, and its successors in interest, are entitled to cut and maintain a ditch over and upon any part of the donation necessary to enable it to take the water from the Santiam, and if, by reason of a change in the bed of the stream or other like cause, it becomes necessary to deepen, widen, or prolong said ditch to get said water, it may be done.

4. INJUNCTION—TRESPASS.

Equity has jurisdiction to enjoin and prevent the commission of a continuous trespass, on the ground of the inadequacy of the remedy at law.

(*Syllabus by the Court.*)

In Equity.   On bill for injunction.
*William B. Gilbert*, for plaintiff.
*Parrish L. Willis*, for defendant.

DEADY, J.   This suit is brought by the Salem Capital Flour-Mills Company, a British corporation, against the Stayton Water-Ditch & Canal Company, a corporation formed under the laws of Oregon, and Silas A. and S. W. R. Jones, citizens of Oregon, to have said defendants enjoined from interfering with the prolongation of the plaintiff's ditch, whereby water is taken from the Santiam river and conducted in the channel of Mill creek to Salem, for the use of the plaintiff's mills; and from diverting the water from the same.

The defendants demur to the bill, for that the plaintiff is not entitled to the relief sought.

For a proper understanding of the case, a somewhat full abstract of the lengthy second amended bill, and the amendment thereto, must be made.

It appears therefrom that on December 17, 1856, the legislature of the territory of Oregon passed an act incorporating the Wallamet Woolen Manufacturing Company, hereinafter called the "Woolen Company," and thereby conferred upon it "power to bring water from the Santiam river to any place in or near Salem," through the channel of Mill creek, as far as practicable; and for such purpose authorized it to enter "upon lands, and also upon said creek, and do all things proper and suitable for a safe, direct, and economical conveyance of water as aforesaid;" and conferred on said company the exclusive right to the hydraulic powers and privileges created by the water which it takes from the Santiam river,"

and to "use, rent, or sell the same, or any portion thereof, as it may deem expedient."

Under this act the woolen company, at great expense, forthwith dug a ditch from a point on the right-hand bank of the Santiam, near the town of Stayton, to a point in the channel of Mill creek, and did thereby conduct water from the Santiam through said channel to Salem; that in 1857 the woolen company erected woolen mills at Salem on the bank of said Mill creek, on land then belonging to it, and particularly described in the bill, and thenceforward, until May, 1876, when the building was destroyed by fire, operated the same continuously by force of said water; that said water-power was and is of great value, and the woolen company kept the exclusive use of the same until April 11, 1870, when it granted to the Salem Flouring Mills Company the right to have one-half the water flowing through said ditch and channel to Salem, conducted to its premises therein, and the water-right granted to William Waldo on May 1, 1874.

On August 24, 1875, the woolen company executed and delivered to the Bank of British Columbia a mortgage on all the said property, rights, and privileges so owned by it, and thereafter, in a suit brought in this court to enforce the lien of said mortgage, the same was sold and conveyed to William Reed on September 6, 1882, who afterwards sold and conveyed it to the City of Salem Company, which company, on June 1, 1884, sold and conveyed the same to the plaintiff, which thereupon became, and still is, the owner thereof; that the grant to Waldo was a perpetual right to use the water so brought to Salem for the purpose of operating a flour mill to be built on a tract of ground on the bank of Mill creek just below the property of the woolen company, and containing about two acres, whereupon he erected a flour mill, which, since 1877, has been operated by the water aforesaid, and about June 1, 1884, the plaintiff, by mesne conveyances from Waldo to itself, became and still is the owner of said mill property and water-rights; and that in 1882 the plaintiff built another flour mill on property adjacent to said mill, and said flour mills have ever since been operated by the water of the Santiam, and would be comparatively valueless without the same.

The ditch was constructed from near the town of Stayton to the Santiam on the donation of Stephen Porter and his wife, who theretofore, on April 3, 1856, for a valuable consideration, had by their deed granted to George H. Williams, Joseph Watt, and A. H. Reynolds, to the use of said woolen company, "the right of a canal way through all and any lands then owned or occupied by them in Marion county, necessary to be passed through in conveying the water of the Santiam into the channel of Mill creek," and also granted to said persons, for the benefit of said company, authority "to enter on the same for the purpose of cutting a canal sufficiently large to admit the flow of any amount of water required by said company for their puposes at Salem," and agreed "to allow them all the rights and privileges necessary for the construction, use, and preservation of said canal;" that at the date of such conveyance,

said Williams, Watt, and Reynolds were the trustees of the corporation for whose benefit said rights were conveyed, and the plaintiff by the mesne conveyances aforesaid "has become and now is the owner of and entitled to all the rights, powers, and privileges thereby granted."

On May 7, 1852, the date of the official survey of the donation of Stephen Porter and wife, the meandered line of the north bank of the Santiam was the southern boundary of the same, which included all the land in the fractional S. E. ¼ of section 10, and the fractional S. W. ¼ of section 11, in township 9 S., of range 1 W., of the Wallamet meridian, lying north of said meandered line, as shown on the map entitled "Exhibit A;" that at the time of the execution of the deed by Porter and wife, and the construction of the ditch, the position of the Santiam had gradually changed to the northward, so that the north bank of the same crossed the line between said sections 10 and 11, 8.25 chains north of its intersection with said meandered line; that said ditch took water from the north bank of the Santiam at a point 15 chains west of the line dividing said sections, and 6.75 chains from the nearest point on said meandered line, and designated on Exhibit A as "W. W. Mfg. Co.'s dam, built in 1857;" and said woolen company continued to receive water into its ditch at said point for the use of its mills at Salem until 1872, when, by reason of a freshet in the river, the channel thereof was suddenly changed to the southward 30 chains from the point where the ditch connected therewith, and has ever since flowed in this new channel; wherefore said woolen company was obliged, and did, in 1873, prolong its ditch eastward from its eastern terminus, along the right bank of the old channel of the river to the junction with the new. and in so doing expended a large sum of money in excavating said channel, in banking the left side of the ditch, and in constructing wing-dams and head-gates thereon, and thereby received and used the water of the Santiam, as before.

On July 20, 1876, Stephen Porter and wife made a conveyance, to sundry persons, of the land on which the ditch was prolonged as aforesaid, and thereafter the grantees therein, on January 12, 1877, and Drury Stayton, who had been placed in possession of the ditch by the woolen company, to care for the same and regulate the flow of water therein, conspired together and took possession of the prolongation of the ditch, claiming a right to the same, and on November 12, 1879, said grantees conveyed the same to the defendant Silas A. Jones.

In January, 1880, the defendants Silas A. and S. W. R. Jones procured the incorporation of the defendant, the Stayton Water, Ditch & Canal Company, of which they are the principal stockholders, for the purpose of constructing and maintaining a ditch from the town of Stayton to a point on the north bank of the Santiam, where the prolongation of the plaintiff's ditch terminates; that said corporation took possession of said prolongation, and conducted water through the same to and below the point where the plaintiff's ditch terminated in 1872; and, by means of a canal there connecting with said ditch, supplied the town of Stayton with water; and said Silas A. Jones has given some pretended

license or easement to said Stayton Company in and about said prolongation, to the plaintiff unknown, and did, in 1886, convey to S. W. R. Jones the property acquired by him under the deed of November 12, 1879; that from the formation of the Stayton corporation until 1882, it and the defendant Silas A. Jones held possession of said prolongation, denying any right of the plaintiff's grantor thereto, and in 1882 said corporation constructed a ditch from a point on said prolongation, fifteen chains west of the eastern end thereof, in a south-westerly direction to a point six chains south, and below the eastern end of the plaintiff's ditch, and thence to the old canal leading to Stayton, whereby the defendants can send the water which is received from the Santiam, at the eastern end of the prolongation, to the town of Stayton, and shut it off altogether from the plaintiff's ditch, and thus prevent it from reaching Mill creek, and they have, since 1883, refused to allow any of the water of the Santiam to flow into the prolongation beyond said point of diversion, unless the plaintiff or its grantors would pay them for the same; that said defendants have threatened and do threaten that, unless the plaintiff will recognize their claim, and pay them what they demand therefor, they will not allow any water to flow into its ditch, and thereby deprive it of the use of the water of the Santiam; and said defendants assert that they have been in the continuous and adverse possession of said prolongation, through said Drury Stayton and others, since January 12, 1877, claiming to own the same, and that in 10 years therefrom they will have acquired the exclusive right thereto; that the acts of the defendants in this respect have been without the consent, and against the protest, of the plaintiff and its grantors.

In January, 1877, the woolen company temporarily ceased to use said ditch and water-power, and, having no officer or agent at or near Stayton, had no knowledge of the claim made by the defendants or their grantors to the same until the defendants began the construction of their ditch in 1882, at which time the title of plaintiff's grantors to said ditch and the privileges connected therewith, as derived from the act of the legislature aforesaid, had been controverted in this court in the suit to enforce the lien of the mortgage aforesaid, on the ground that the woolen company could not mortgage or transfer the same; and after the decision of this court in favor of the right, the case was appealed to the supreme court of the United States, where a decision in favor of such right was not reached until December, 1886, but for which litigation the plaintiff and its grantors would long since have brought suit to protect their rights.

The capital stock of the Stayton corporation is $4,000, fully paid up, and both it and Silas A. Jones are insolvent; but, as to S. W. R. Jones, the plaintiff is not advised as to his responsibility or the extent and nature of his claim to said property or water-rights.

The bill prays that the defendants may be enjoined from interfering with the flow of water in said prolongation, or asserting any right thereto, and that they be required to remove the dam constructed across the same, and close up the opening made by them in the left bank thereof.

The first question raised by the demurrer is as to the nature and ex-

tent of the "power" or "privilege" granted to the woolen company concerning the water of the Santiam by the act of 1856, and its authority to dispose of the same.

The unqualified right to take water from the Santiam, and conduct the same to or near Salem through the channel of Mill creek, is expressly granted by section 5 of the act; and for such purpose the company is thereby also authorized to enter on "lands" and said "creek," "and do all things proper and suitable for a safe, direct, and economical conveyance" of such water, subject to the payment of damages for any injury to the property of another.

Section 6 of the act provides:

"Said corporation shall have the exclusive right to the hydraulic powers and privileges created by the water which is taken from the Santiam river, and may use, rent, and sell the same, or any portion thereof, as it may deem expedient."

The purpose and intent of this section is plain enough, although it must be admitted that its composition is faulty and confused. The "hydraulic powers" are "created by the water" in motion after it is taken from the Santiam; in fact, it is the power of the water in motion. This power the company was authorized to dispose of in whole or in part wherever it existed. But the water created no "privilege." That was created by the act, and consisted in the right to take water for hydraulic purposes out of the Santiam. This "privilege" and the "power" resulting from its exercise, the woolen company was authorized by this section to dispose of by mortgage or otherwise. It was so held by this court in the suit to enforce the lien of the mortgage given by the company to the Bank of British Columbia, and on an appeal to the supreme court, the ruling was affirmed, (*Manufacturing Co.* v. *Bank*, 119 U. S. 191, 7 Sup. Ct. Rep. 187;) and there ought never to have been any question about it.

The extent and nature of the power consists simply in the right to take water from the Santiam, without limit or restriction as to quantity or place, and conduct the same to Salem by the route indicated. The river may be tapped at more than one place at the same or successive times. In short, there is no limitation on the power, and it is granted subject to only one condition,—that the company "shall be answerable in damages to any person whose property is injured by its acts."

And now, what right did the plaintiff's grantor, the woolen company, acquire under the deed of Porter and wife? This deed grants to Williams, Watts, and Reynolds, for the consideration of $400, the right to cut a canal-way through any lands owned or occupied by the grantors, for the purpose of taking the water out of the Santiam, to the channel of Mill creek, in any amount the company may require for its "purposes at Salem;" and the grantors therein thereby agree to allow the company "all the rights and privileges necessary for the construction, use, and preservation of said canal."

The power and privilege was not exhausted by the construction of the ditch to a certain point on the river in 1857. For the purpose of main-

taining a canal or ditch on, over, and through the Porter donation, so as to receive and take water from the Santiam thereon, in such quantity as the company or its successors in interest might or may need or require at Salem, it continued and still continues in full force. Therefore, when the channel of the Santiam was, in 1872, suddenly deflected to the southward, and away from the eastern terminus of the woolen company's ditch, so that no water flowed therein, the company had a right to make any necessary prolongation of the same, anywhere on such donation, including the former bed or channel of the river, so that sufficient water would again flow through it to the channel of Mill creek.

But the same result would follow, if the stipulation for the "preservation" of the ditch was not in the Porter deed. In the nature of things, and by the terms of the deed, the grant was in fee,—without limitation. The act then and since in force in regard to conveyances provides:

"The term 'heirs,' or other words of inheritance, shall not be necessary to create or convey an estate in fee-simple; and any conveyance of any real estate hereafter executed shall pass all the estate of the grantor, unless the intent to pass a less estate shall appear by express terms, or be necessarily implied in the terms of the grant."

This provision is applicable to the grant of an easement which is an interest in land, by deed, such as the plaintiff claims in the Porter donation. This easement may be for years, for life, or in fee, (Washb. Easem. 4th Ed. 26,) owing to the terms of the deed, and the circumstances under which it was executed, subject, however, to the rule prescribed by this statute, that no words of inheritance are necessary to create an easement in fee, and that the duration of the grant shall equal that of the estate of the grantor in the lands subject to the easement, unless a contrary purpose shall appear.

At the date of the grant of the easement, Porter and wife were seized of an estate of inheritance in the land, and there is nothing in the terms of their deed or the nature or purpose of the easement which at all indicates an intention to grant the easement for a less time than the duration of their own estate in the premises, but the contrary. Hence the right to maintain a ditch on and through the Porter donation was to conduct water from the Santiam to the channel of Mill creek, for the purposes of the woolen company at Salem, is perpetual; and if, in the course of time or events, it becomes necessary, to accomplish such purposes, to widen, deepen, or lengthen said ditch, the then owner of the easement may do so.

As was said in *Pomfret* v. *Ricroft*, 1 Saund. 322, "When the use of anything is granted, everything is granted by which the grantee may have and enjoy such use." See, also, on this point, *Prescott* v. *White*, 21 Pick. 341; *Collins* v. *Driscoll*, 34 Conn. 43; *Donnell* v. *Humphreys*, 1 Mont. 518; *Dyer* v. *Depui*, 5 Whart. 584; *Thompson* v. *Uglow*, 4 Or. 369.

But the right of the woolen company to flow the water of the Santiam over the old bed of the river to its ditch, may be rested on another ground than its right to prolong its ditch, and use such old bed for such prolongation. When a stream is suddenly diverted from its chan-

nel, any person who has acquired a right to the water flowing in such channel may return it to the same.   Washb. Easem. (4th Ed.) 444. The woolen company, as the grantee of Porter and wife, had an interest in the flow of the Santiam in its channel by the eastern end of its ditch, and therefore upon its sudden diversion to the southward it had a right to turn the river back to the old channel, or at least, so much thereof as was necessary for its "purposes at Salem."   And in so doing, it might facilitate the passage of water from the new to the old channel, and through the latter to its ditch, by wing-dams, and by deepening and cleaning the same, and confining the flow within narrower limits, or other proper and suitable means.

But whether the course of the Santiam changed suddenly or gradually, so long as it ran over or upon any portion of the Porter donation, the woolen company had a right under the grant to prolong or extend its ditch over and upon the same to the river, and take the water therefrom, and conduct that same to the channel of Mill creek, and thence to Salem. And, in my judgment, if the Santiam should change its course, so as to leave the Porter donation altogether, the party entitled to the benefit or privilege granted to the company might extend this ditch in any direction through said donation, so as to reach the stream and take water therefrom.

But it is objected that the deed from Porter and wife is void for want of a *cestui que trust* at the date of its execution.

It appears from the deed and act that a number of persons were then associated together in what they called "a joint stock company," under the name of the "Wallamet Woolen Manufacturing Company."   As a matter of law the association was nothing but a partnership doing business under this name, as it lawfully might.   The grant was made to Williams and Watt, two of the partners, and Reynolds, for the use of the company, and soon after the persons constituting the same were by the legislature "declared a body politic and corporate," with the organization and name then in use by them.   The natural persons constituting this association, partnership, or company, and calling themselves collectively the "Wallamet Woolen Manufacturing Company," were in existence at the date of the deed, and capable of taking the beneficiary interest in the grant.   The description of them as stockholders in a certain "joint stock company," was a sufficient designation of them.   *Friedman* v. *Goodwin*, McAll. 149.   But if this were otherwise, and there was no *cestui que trust* or use in existence at the date of the deed, nor until the actual incorporation of the woolen company in the December following, the objection is not well taken.   Mr. Washburn, (2 Washb. Real Prop. 3d Ed. 173,) after a careful review of the authorities, says: "It may be laid down as a general proposition that it is not necessary, in order to create a trust-estate, that a *cestui que trust* should be named who is in being."   And again (Id. 198) he says: "A trust may be valid and effectual, where a trustee is named, although the *cestui que trust* may not then be *in esse*, provided such *cestui que trust* subsequently came into being."   See, also, on this point, *Ashhurst* v. *Given*, 5 Watts & S. 328; *Urket* v. *Coryell*, Id. 60.

Counsel for the defendants sets out the deed in his brief, as it should have been in the bill, from which it appears that the consideration for the deed was $400, and that. thereby Porter and wife did "release and quitclaim" to the trustees therein named the easement in question, to the use of the woolen company "alone;" and that the word "assigns" is not used therein, or any other word or phrase indicating an intention on the part of the grantors that any assignee or successor in interest of the company should have or exercise the rights and privileges thereby granted.

The' term "assigns" is not necessary in a deed, either as a word of limitation denoting the quantity of the estate granted, or to give the grantee authority to dispose of the same. When the woolen company acquired the easement in question, it took the same with the rights to dispose of it at pleasure, unless restrained by some express provision in the deed, or for lack of authority as a corporation. The deed contains no such provision, and the act, as we have seen, conferred on the company an unqualified power of disposal.

The necessity of using the word "alone" in this connection is not apparent. But the only effect that can be given to it, with any show of sense or reason, is that the trustees named in the deed took the right and privilege thereby granted, not for themselves, but *solely* for the use and benefit of the woolen company; and this is no restraint on the disposing power of the latter. And a voluntary sale of the right and privilege by the company, or one made on legal process, to satisfy its debts, would so far be a disposition to the "alone" or sole use of the company. If Porter and wife had sold their donation outright to these three trustees, to the use of the woolen company "alone," the result would have been the same. The company, being the owner of the property, could dispose of it when and to whom it pleased.

And lastly, it is objected that this right is an easement in gross, and therefore not assignable by the grantee, the woolen company. In support of this conclusion it is claimed that there is no land or estate described in the deed in connection with which the water taken from the Santiam was to be used.

It is common learning that a right or easement in or upon the land of another, to be used by the grantee generally, and not in connection with or dependent upon any other land or estate, is not assignable. It is called a right in gross,—in bulk. It belongs to the person, and dies with him. But an easement, such as a right of way over the land of another, or to take water therefrom, is said to be appurtenant or appendant when the grant thereof is made with reference to other land, whereon, or in connection wherewith, it is to be used or enjoyed. The land which is burdened with the way, or from which the water is taken, is called the servient estate, while that which is benefited by the easement is called the dominant estate. The easement is said to be appendant or appurtenant to the dominant estate, and passes with it as an incident thereof. 3 Washb. Real Prop. 340; Washb. Easem. 2, 18.

An easement appurtenant, as against one in gross, is favored in the law, and courts will not construe a grant of an easement to be a mere

personal right, unless such intent plainly appears.   Mr. Washburn (Washb. Easem. 45) says:

"Though an easement, like a right of way, may be created by grant in gross, as it is called, or attached to the person of the grantee, this is never presumed when it can fairly be construed to be appurtenant to some other estate, and, if it is in gross, it cannot extend beyond the life of the grantee."

The deed of April 3, 1856, provides that the canal to be cut through the grantors' land shall be "sufficiently large to admit the flow of any amount of water required by said company for their purposes at Salem, and agree to allow them all the rights and privileges necessary for the construction, use, and preservation of said canal."

It is manifest from the deed, and the circumstances attending its execution, that the grant to the woolen company was made and received with the intent and purpose that the water of the Santiam would be taken from and through the Porter donation, and conducted by the company to or near Salem, and there used, at least to operate the mill or mills of the grantee then or thereafter to be built at that place.   There being no limit to the time when the grantee should commence to take and conduct this water to Salem, or the quantity it may take and use, and as the grant is in fee and assignable with the dominant estate, in my judgment, the owner of such estate, or its successors in interest, may continue to take this water from the Santiam, and conduct it to Salem, and there use it to operate any mill or machinery owned by them, no matter when erected.

And under power given to the woolen company, by its act of incorporation, to dispose of the water at pleasure, it and its successors in interest in the dominant estate and this easement and appurtenances thereto, may conduct and deliver this water at Salem for hydraulic purposes to others on such terms and conditions as may be agreed on.   Of course, the legislature could not confer on the company any right to enter on the land of the Porters, and take this water without their consent, or the payment of damages therefor.

But the deed of Porter and wife practically gives the company the right to take out of the river on the Porter donation all the water it wants for its purposes at Salem; and the disposition of it, when there, as authorized by the act, cannot work any prejudice or wrong to the grantors, or their assigns, by a subsequent grant or conveyance, such as these defendants claim to be.

The right to relief in equity, under the circumstances, is clear.   The remedy at law is utterly inadequate.   The interference of the defendants with the prolongation of the plaintiff's ditch, and the flow of water therein, is a continuous trespass, and an injunction will be allowed to prevent it, at least on the ground of preventing a multiplicity of suits. The remedy by an action at law for each act or each day the trespass is repeated is altogether inadequate.   3 Pom. Eq. Jur. § 1357; *Coulson* v. *City of Portland*, 1 Deady, 494.

Counsel for the defendants in his brief refers to an action of ejectment pending in this court by the plaintiff against these defendants for the

possession of the prolongation of this ditch; but the result of the action will not determine the right of the defendants to take water therefrom, nor prevent the defendants from lowering the willow dam which they have constructed below the old dam of the plaintiff's which they have partially removed, by which means they can draw off all the water that enters said prolongation, and not allow any of it to enter the ditch leading to Mill creek.

The demurrer is overruled.