Argued March 3, affirmed in part, reversed in part November 25,
1953, petition for rehearing denied February 10, 1954

## POWERS ET UX. *v.* COOS BAY LUMBER
## COMPANY
### 263 P. 2d 913

330

*Howard T. McCulloch,* of Portland, argued the cause for appellants. With him on the brief was William E. Walsh, of Coos Bay.

*J. D. Bedingfield,* of Coos Bay, argued the cause for respondent. With him on the brief was D. J. Grant, of Coos Bay.

Before Latourette, Chief Justice, and Warner, Rossman, Lusk, Tooze and Perry, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs, husband and wife, from a decree which the circuit court entered in favor of the defendant in a suit wherein the plaintiffs, according to the prayer of their complaint, sought "judgment against defendant for the sum of $25,000 and for a decree permanently enjoining defendant from committing any further trespass upon plaintiffs' said lands." The challenged decree awarded the plaintiffs damages in the amount of $547.10, but not by reason of the purported trespasses. It granted them no injunctive relief.

The subject matter of this suit is five strips of land, each 100 feet wide. Beginning with 1915 and continuing until recently, the longest of the strips had been the roadbed of a logging railway. In 1946 the defendant converted a part of the railroad right of way into a log truck road and most of the remainder in 1949 and 1950. When that was done, resort was had to the shorter strips in order to detour around some sections of the railroad right of way, such as a tunnel, which the defendant did not incorporate into the truck road. The five strips lie within a tract in Coos and Curry counties owned by the plaintiffs containing 8000 acres. Upon its northeast side the tract reaches to the town of Powers. Its western side extends into the headwaters of Sixes River. The longest of the strips of right of way meanders across the plaintiffs' land for a distance of ten miles and, until recently, as we have said, was the roadbed of a logging railroad. The latter,

known as the Salmon Creek Railroad, was owned and operated by the defendant. It extended from Powers in the east to about one and one half miles west of the Coos-Curry line. For eight miles or so it followed a stream known as Salmon Creek and the headwaters of the latter. The headwaters are near the Coos-Curry line. Beyond them the Sixes River, which flows westerly, has its origin. Salmon Creek takes a northeasterly course. After the railroad left Salmon Creek its westerly course, for a mile or so, led toward the Sixes River and ended there. As a result of the work done by the defendant in 1946 and in 1949-1950 all parts of the right of way of the former logging railroad suitable to a log truck road are now parts of the one above mentioned.

So far we have confined ourselves largely to only one of the five strips of right of way. We shall now give brief attention to the other four. Two of the latter are each almost a mile long; the other two are short. One of the short sections by-passes a tunnel which the railroad had used. The other enables the log truck road to avoid a low area. One of the mile-long strips avoids some lengthy railroad trestles by resorting to nearby higher ground. The other long strip affords the log truck road a better grade than the railroad had employed. Apart from these four departures from the logging railroad right of way, the log truck road employs the same right of way which the railroad used. The digressions total almost two and one half miles in length and depart as much as 700 feet from the railroad right of way. When the logging railroad was first supplanted by the road, the latter was built to a width of about 12 feet and its surface was graveled. In 1950 it was widened and its roadbed was graveled

to a width of 25 feet. The witnesses described the log truck road as a two-lane thoroughfare.

Stated briefly, the defendant contends that it is (1) the owner in fee of part of the railroad right of way and owner of an easement over the remaining part; and (2) grantee from the plaintiff of an irrevocable parol license which enabled it to construct the log truck road, especially at the places where it departs from the old railroad right of way. The plaintiffs deny that the defendant was ever the owner of the fee in any part of the railroad's right of way, and aver that the defendant's easement in the right of way terminated when it dismantled the railroad. They deny that they granted the defendant a parol license to build or use the log truck road.

In 1950, after the defendant had torn up the rails and ties of the railroad and had almost completed its work of converting the right of way into the log truck road, the plaintiff instituted this suit.

The five strips of right of way which are in controversy lie in Sections 26, 34 and 31, Township 31 South, Range 12 West, Willamette Meridian, and Sections 4, 9, 8, 7, and 6, Township 32 South, Range 12 West, Willamette Meridian. A part of the plaintiffs' 8000 acres, of course, also lies in those sections. Since none of the sections involved in this appeal have number duplications in the two townships, we shall, in proceeding, omit the township numbers and give only the section numbers. During the trial, the parties termed one part of the plaintiffs' property as the westerly section and the other as the easterly. By "westerly" they meant Sections 31, 6, 7, 8 and the NW ¼ of the NW ¼ of Section 9. By the "easterly" section they referred to part of Section 9 and all of Sections 4, 34 and 26.

The course taken by the old logging railroad and its successor, the present log truck road, roughly resembles the shape of a distended horseshoe. The eastern end of the horseshoe is in Section 26, and the western end is in the southwest quarter of Section 31. The lower arc of the curve passes through the north half of Section 8. The section numbers mentioned in previous paragraphs are given in the order in which they adjoin each other in the horseshoe formation.

As is evident, the plaintiffs claim that they are the owners of the five strips and that the latter are free from any easements held by the defendant. The defendant never had any interest in their land except an easement for the railroad right of way. They further contend that the defendant abandoned the easement when it dismantled the railroad and converted the right of way into a vehicular road. Those contentions are the basis of the plaintiffs' claim that the defendant is a trespasser upon all five strips and that they (plaintiffs) are entitled to damages and an injunction. The defendant, as we have seen, contends that it is entitled to possession of the five strips. Its contention as to title are two-fold in character: (1) citing the provisions of some deeds, it asserts ownership of the fee of a part of the ten-mile strip and claims an easement in other parts; and (2) it possesses an irrevocable parol license.

We now take notice of the provisions of the decree. The first paragraph holds:

> "The defendant is now and at all times since April 14, 1945, has been the owner in fee of and had and now has the right to construct, maintain and use a log trucking road upon and along a strip of land 100 feet in width"

in Sections 26, 34, 4 and the NE ½ of the NW ¼ and the SW ¼ of the NW ¼ of Section 9. That part of

the right of way, it will be noticed, lies in the area which the parties term the easterly section of the plaintiffs' property. The decree describes the strip by courses and distances. The description is accompanied by a reference to the railroad which, in the instance of Section 26, reads as follows: "* * * which center line, hereinabove described, within said Section 26 is the center line of a railroad formerly constructed thereover".

The second paragraph of the decree holds:

"That defendant is now and at all times since April 14, 1945, has been the owner of the easement and right of way to construct, maintain and use a log trucking road upon, over and along a 100 foot strip of land across the lands of plaintiffs, which lands and the center line of said 100 foot strip of land are described as follows: * * * the NW ¼ of the NW ¼ of Section 9 * * *. Sections 8, 7 and 6 * * * and Section 31 * * *."

It will be observed that while paragraph one speaks of the "fee", paragraph two holds that the defendant is "the owner of the easement and right of way" in the sections mentioned in it. The description of the strip in the sections mentioned in paragraph two is given in courses and distances. The description of the part of the strip which lay in the fractional part of Section 9 is accompanied with a reference to the railroad right of way couched in terms similar to that of which we took notice when we mentioned Section 26. The description of the strip in Sections 8, 7, 6 and 31 concludes with these words: "being the end of a railroad constructed on said strip of land". Thus, the description given in the decree carried the strip to the end of the railroad in Section 31. The railroad extended for only 200 or 300 feet in Section 31.

The third paragraph of the decree said:

"That the defendant by reason of rights reserved to it by the following deeds, to-wit: *  *  * is now and since April 14, 1945 has been the owner of the easement and right to construct, maintain and use the trucking road as now constructed and laid out upon and across the SW ¼ of Section 31, *  *  *."

Those words mention the "trucking road", not the railroad. Following the quoted words there begins a description by courses and distances which extended the easement for the road in a meandering line across the SW ¼ of Section 31, that is, beyond the end of the railroad. The plaintiffs own no lands west of Section 31 and, accordingly, the description in the decree, having taken the easement to the westerly line of Section 31, terminated there. The deeds mentioned in the language last quoted were dated November 26, 1917, June 9, 1922, and November 20, 1924. We shall give them attention later.

The fourth paragraph of the decree said:

"That in addition to the defendant's right and ownership as hereinabove in paragraph 1, 2, 3 and 4 hereof decreed, the plaintiffs prior to the construction of its trucking road, as now laid out and constructed, *  *  * granted and gave to defendant a parol license to construct, maintain and use said trucking road *  *  *. That the defendant relied upon said consent and license of plaintiff and constructed said trucking road at great expense to defendant. That said parol license is irrevocable; *  *  *."

The paragraphs prior to the fourth were based upon deeds; the fourth, it will be noticed, held that the defendant possessed "a parol license" over the entire length of the log truck road.

The fifth paragraph of the decree declared:

"That the plaintiffs granted and gave to de-defendant, and defendant is and was at the time of the construction of said trucking road the owner of an irrevocable parol license to construct the same on lands of plaintiffs adjacent to the 100 foot strip of land upon plaintiffs' properties as described in paragraphs 1, 2 and 3 above of this decree, which deviations from said 100 foot strip of land so used by the defendant pursuant to the said irrevocable parol license are located in Section 26 and 34, Township 31 South, Range 12 West of the Willamette Meridian and in Sections 4 and 6 in Township 32 South, Range 12 West of the Willamette Meridian; * * * * "

The term "deviations", as used in the decree, was employed during the trial in a similar vein to designate the four short strips or detours of which we have taken notice. We call attention to the fact that Paragraph IV, in speaking of the irrevocable parol license, referred to the part of the log truck road which was built upon the logging railroad right of way, whereas Paragraph V is concerned with the part of the road built upon the deviations. The plaintiffs direct attention to errors in description of the right of way in Sections 4 and 34. We infer that those errors will be corrected upon remand of the case.

The sixth paragraph of the decree held:

"That the defendant has not abandoned any right of way or easement heretofore owned by it upon or across any lands of plaintiffs in this decree described."

By way of summing up, we take notice of the fact that the decree holds that the defendant (1) is the owner in fee of the part of the 100-foot strip which formerly constituted the railroad right of way in Sec-

tions 26, 34, 4 and part of 9 (easterly section) ; (2) is the owner of an easement upon the strip 100 feet wide which formerly was the railroad right of way and which lies in Sections 8, 7, 6 and parts of 9 and 31 (westerly section) ; (3) owns an easement for a roadway in parts of Section 31; (4) in addition to the above-delineated rights, possesses an irrevocable parol license to construct, maintain and use the log truck road which it has built in part upon the four ancillary strips which deviate from the logging railroad right of way. Such is the attacked decree. The importance which the plaintiffs attach to the provisions of the decree, which held that the defendant possesses an irrevocable parol license, is indicated by the following sentence which we take from their brief: "The third and probably the main phase of appellants' brief will be devoted to the subject of 'irrevocable license'."

We shall now review the evidence, including the title instruments upon which the parties rely. An adequate understanding of the evidence is particularly essential in this case. In reviewing the evidence, we will take notice of the contentions of the parties, but will postpone our disposition of them until we have set forth a summary of the entire transcript.

The logging railroad was built by the defendant in 1915 or prior thereto. January 17, 1929, the defendant sold the railroad and some of its other properties, but on April 14, 1945, reacquired all of them. Apart from that interlude, the defendant has owned the railroad continuously since it was built. The plaintiffs have owned their property for more than twenty years.

At the time of the railroad's construction, the 8000-acre tract now owned by the plaintiffs was covered with timber and, as the latter was felled, the railroad brought the logs to sawmills. At that time the 8000

acres were owned by the defendant. Some years after the timber had been cut, the plaintiffs, or their predecessors in interest, purchased from the defendant the logged-off land. We shall presently mention the years and the contents of the deeds. At the time of the trial, witnesses described the 8000-acre tract as containing about 1000 acres of pastureland upon which the plaintiffs were raising cattle and about 3500 acres of reforestation land.

So far, we have seen that about two score of years ago the defendant built across the land now owned by the plaintiffs a logging railroad and that the latter operated until recently. The record indicates that the railroad hauled logs for the last time in 1945. It remained in satisfactory condition as a logging railroad until 1947 or 1948, with the exception of the part of the line in Section 6 which was supplanted with a gravel road in 1946. After the defendant ceased its log shipments in 1945 the railroad served the defendant's incidental purposes, and the plaintiffs continued to exercise their right to use it. The defendant presented evidence which it contends shows that it still needs all of the right of way across the plaintiffs' land, and that its wants will continue indefinitely. The purported needs were revealed by evidence of which we now take notice.

The defendant owns 28,000 acres which lie west of Section 31 in the Sixes River area containing three fourths of a billion feet of timber. Adjacent to that large tract, and in places interspersed with it, are other timber tracts owned by the Federal Government which may be rendered available to the defendant for purchase. The defendant has adopted plans for cutting its Sixes timber and of moving it to market. Pursuant to them, it extended into its tract the road which we

have described. The plans contemplate that the Sixes River timber, when cut, will move to market upon the right of way which we have been describing, but the timber may be permitted to stand uncut for ten years or even twenty-five. The defendant's officers testified that when the timber is cut, the defendant may restore the railroad and bring the logs to Powers upon it. Economy of operation at the time the Sixes timber is cut will determine whether the defendant will restore the railroad or use the recently built two-lane road. Albert H. Powers, one of the two plaintiffs, to whom we will hereafter refer as Powers, conceded that the most feasible route for bringing the Sixes timber to market is over the contested right of way. After he had declared that he had known for many years that the defendant owned the Sixes timber, he testified:

"Q You knew all that time that there was no other means of removing the Sixes timber except by that railroad or by some other means, down Salmon Creek, to Powers?

"A I presumed, like everybody else did, that if it didn't burn up, that that timber would come down the Salmon Creek railroad."

The only other route whereby logs produced from the Sixes tract can reach the defendant's mills is a county road which touches Section 31 and, proceeding westerly, terminates in the Coast Highway (No. 101). Logs hauled over it travel 78 miles before they reach the defendant's manufacturing plants. Trucks that use that route move upon public thoroughfares, and therefore are subject to our statutes which, for example, regulate the size of the load and impose truck and gasoline taxes. Upon the other hand, if the defendant can use the road which it has built across the plaintiffs' 8000-acre tract, its vehicles will travel a much shorter distance and will operate upon privately owned roads.

In addition to its large Sixes River timber tract, the defendant owns other timber in the general vicinity of the area which we have mentioned. Reference was made during the trial to a tract known as Eden Ridge, which is served by a logging railroad owned by the defendant similar to the former Salmon Creek railroad. The Eden Ridge tract produces for the defendant's mills 40 million feet of logs annually. The logging railroad which serves it runs into Powers and there connects with the defendant's main line which extends into Myrtle Point. At the latter place the line connects with the rails of the Southern Pacific Company.

The defendant operates mills at Coquille, Millington and Coos Bay. The mill in Coquille, according to the defendant's manager, is "a plywood and cedar mill"; the one at Millington is "a spruce gang and finish plant"; and the one at Coos Bay is a sawmill. In Powers the defendant maintains a pond and other facilities which enable it to sort and grade the logs which its logging operations produce. After the logs have been sorted they are hauled to the appropriate mill. The advantages afforded by those facilities will be lost to the defendant as to its Sixes tract unless it can use the Salmon Creek right of way.

The decree holds that the defendant's right to maintain and use the logging railroad was derived by it in part from the provisions of some deeds. A better understanding of the deeds will be gained if we first take notice of another set of circumstances. We have mentioned the fact that January 17, 1929, the defendant sold the Sixes timber, the Salmon Creek railroad and the easements upon which its tracks lay to the Port Orford Cedar Products Company. That company, in order to obtain the money with which to pay the purchase price, borrowed from a Chicago bank and se-

cured payment of the borrowed sums by a mortgage which encumbered the purchased properties. Before long the Port Orford Company defaulted in the payment of the mortgage indebtedness, the mortgagee foreclosed the mortgage and the properties were sold to a new corporation entitled Pacific White Cedar Company which subsequently changed its name to Port Orford Cedar Company. April 14, 1945, the defendant and the Port Orford Cedar Company merged under the name of the defendant. In that manner, the title to the properties was again vested in the defendant's name.

We now return to the year 1917. On November 26 of that year the defendant executed and delivered the first of the three deeds whereby it parted with title to the logged-off lands and reserved to itself right of way for the railroad. The record identifies the deed as Exhibit A. The grantee was Powers' mother. The plaintiffs freely concede that when that deed and the two others, which we will presently analyze, were executed, the logging railroad had been built, was in operation and all were aware of those facts. For example, Powers told of a visit which he made in 1915, when he was 15 years of age and his father was the defendant's logging superintendent, to the scene of the defendant's logging operations in the Salmon Creek region. He then saw the railroad. He mentioned other occasions in the early days when he made visits to the defendant's logging camp in the Salmon Creek region and rode upon its speeders. The plaintiffs' brief, referring to the deeds which we now have under review, says:

"At the time these various conveyances were made and for many years thereafter, respondent owned and operated a standard gauge logging rail-

road, which followed very closely the general course of Salmon Creek from the town of Powers, Oregon, up to the county divide and thence for a distance of approximately a mile and a half in the Sixes River watershed."

Concerning the deeds mentioned in that excerpt of the plaintiffs' brief, Powers testified:

"Q You knew that these rights of way were reserved across all that portion of your property which was deeded to your father and mother, being the northwest quarter of the northwest quarter of Section 9, the north half of Section 8, and up through the easterly part of 7 and the easterly part, the easterly half of 6, and across the east half of the northwest quarter of 6, and on through 31, you knew on January 2, 1931 that that right of way had been reserved?

"A In the original deeds?

"Q Yes, to your father and mother.

"A Yes, I knew in the original deeds they had sweeping rights to log the country adjacent to the railroad.

"Q You knew the contents of those deeds?

"A Yes.

"Q When you took the deed from Coos Bay Lumber Company to 26, 34 and 9, you knew of these reservations across this land, didn't you?

"A I knew that there had been sweeping right of way reservations on the property that father bought."

Power's wife, the other plaintiff, did not testify.

The deed of November 26, 1917 (Exhibit A) conveyed to Powers' mother several tracts which form a part of plaintiffs' 8000-acre tract. Referring to the defendant an another grantee, whose identity is immaterial to this appeal, the deed said:

"Excepting and reserving unto the said parties of the first part a right of way not to exceed one

hundred (100) feet in width and the right at any time to establish and maintain a road or roads, railroad or railroads, tramway or tramways of any kind or character in, over and across said premises; provided that the right of way privileges hereby reserved are to be confined to a hundred (100) foot strip of land through the property herein described for a main right of way, * * *; provided further, that in establishing the right of way reserved hereunder, the first parties shall cause as little damage as possible to the bottom lands of the property herein described, and where said right of way shall pass through such bottom land it shall, wherever practicable, be established at the edge of the foothills on the side of the bottom. Further, the right is reserved to establish logging camp or camps and railroad station or stations upon said land; provided further, that said right of way * * * shall be without payment of compensation to the second party, other than the actual damages to any buildings or structures erected thereon or to growing crops."

June 9, 1922, Pacific States Lumber Company executed and delivered to Powers' father a deed of which we will now take notice. The name, Pacific States Lumber Company, was at one time the defendant's. That deed, which the court reporter marked Exhibit B, conveyed to the father several tracts which now constitutes a part of plaintiffs' 8000 acres. It contained this:

"Saving and excepting therefrom the right of way as now established and occupied by the Salmon Creek Spur of the Logging Department of the Pacific States Lumber Company; also a right of way and the right at any time to establish and maintain a road or roads, railroad or railroads, tramway or tramways of any kind or character, in, over and across said premises without payment or compensation to said second party other than the actual

damages to any buildings or structures erected thereon, or growing crops.''

November 20, 1924, the Pacific States Lumber Company executed and delivered another deed, Exhibit C, to Powers' father which described an additional tract forming a part of the 8000 acres. It contained a right-of-way reservation clause couched in the same terms as the one last quoted.

The three conveyances of which we have taken notice were for the lands which constitute the westerly section of plaintiffs' holdings. It is agreed that all of those properties were later conveyed by Powers' parents to him.

The conveyance of the logged-off land in the easterly section of the 8000-acre area to Powers took a somewhat different course. In narrating it, it is necessary to return to a fact which we have already mentioned. January 17, 1929, the defendant made a conveyance of many of its properties to the Port Orford Cedar Products Company. The deed, which became known as Exhibit I, included among other items all of the right of way which the defendant reserved to itself by the deeds of November 26, 1927, June 9, 1922, and November 20, 1924, Exhibits A, B and C. It contained these terms:

''* * * all that Standard Gauge Logging Railroad known as its 'Salmon Creek Branch', beginning at * * * and all other property, real, personal or mixed directly appurtenant to said Salmon Creek Branch of said railroad, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, * * *. Also all rights of way and all rights of any and every character owned or held by the first party in connection with the logging

railroad hereby conveyed or any extension thereof or relocation thereof * * * and especially the following rights of way, to-wit: A right of way one hundred (100) feet in width, extending fifty (50) feet on each side of the center line of the tract as at present laid out and above described across all land now owned by the first party'' [defendant].

When that deed was executed, the defendant owned all of the land which is termed the easterly section of the plaintiffs' holdings. The plaintiffs do not deny that the words just quoted conveyed to the Port Orford Cedar Products Company the right of way through the easterly section of the 8000-acre tract of land. As stated in a previous paragraph of this opinion, the railroad had been constructed and had been in operation for many years prior to the execution of the deed of January 17, 1929. After the conveyance of June 17, 1929, the right of way was taxed separately.

January 2, 1930, approximately one year after the conveyance to the Cedar Products Company, the defendant executed and delivered to Powers a bargain-and-sale deed which conveyed to him the land in the easterly section traversed by the right of way. The consideration was 50 cents an acre. The deed became known as Exhibit H. A year prior to the execution of that deed the defendant had sold the railroad and its right of way to the Port Orford Cedar Products Company (Exhibit I), but it had retained all of the logged-off land in the easterly section. The deed known as Exhibit H conveyed that part of the logged-off lands to Powers. It did not mention, and therefore did not exempt, the right of way, but the plaintiffs' (appellants) brief says:

"Although no exception was made from this deed, Exhibit 'H', of the Salmon Creek Railroad

right of way, appellants make no issue as to the contention of respondent, that was made at the time of trial, that appellants took these lands subject to whatever rights the owners of this railroad, Port Orford Cedar Products Company, had at the time of the grant since the existence of the railroad and its use and operation by a party or parties other than Coos Bay Lumber Company were facts well know to Mr. Powers at the time he accepted the deed of January 2nd, 1930. Appellants concede that in accepting this deed on January 2nd, 1930, they took title subject to such rights as third parties in possession of this railroad had by reason of appellants' actual notice of some claim by those third parties by reason of their occupancy and use of this railroad."

The defendant's answer averred that, through mutual mistake, the defendant's deed of January 2, 1930 (Exhibit H) to Powers failed to contain a reservation of the existing right of way, and prayed for reformation. The original reply, verified by Powers' oath, contained this statement concerning that deed:

"Plaintiffs allege that in the execution and delivery of the deed mentioned in said paragraph V by defendant, and the acceptance thereof by plaintiff Albert H. Powers, it was intended by all of the parties that a right-of-way for the construction, maintenance and operation of a standard gauge railroad over and across the lands mentioned in paragraph IV of defendant's further counterclaim should be accepted [sic] and reserved from said deed  *  *  *."

The next instruments, two in number, which require attention had their inception in the sale by the defendant of its Sixes timber tract, its plant and railroad to the Port Orford Cedar Products Company. One is a deed and the other identifies itself as an agreement.

Both papers were executed January 29, 1929. The deed became known as Exhibit K and the other paper as Exhibit L. Exhibit K bears the signatures of Powers, his wife and parents as grantors. The defendant is the grantee. Exhibit L bears the signature of the defendant only and contemplated no other signature. We have mentioned the defendant's sale to the Cedar Products Company January 17, 1929, and the mortgage loan that the purchasing corporation obtained from a Chicago bank. A previous paragraph took notice of the fact that the deeds of November 26, 1916 (Exhibit A), June 9, 1922 (Exhibit B) and November 20, 1924 (Exhibit C), which reserved to the defendant the right of way in the westerly section of the logged-off lands, did not describe the course of the right of way by engineers' stations or by other means whereby a surveyor could run off the lines. The brief of the appellants (plaintiffs), in accounting for the aforementioned deed (Exhibit K) and agreement (Exhibit L), dwells upon the fact just mentioned (that the easement reservation clauses of deeds A, B and C were couched "in most general terms and without definite location") and indicates that the prospective mortgagee's dissatisfaction with the loose reservation clauses of those deeds led to the execution of the two instruments, Exhibits K and L, which we will shortly summarize. The brief says:

"* * * the mortgagee which was advancing a substantial portion of the purchase money to the purchaser, Port Orford Cedar Products Company, for reasons best known to itself, was dissatisfied with the easement rights pertaining to this Salmon Creek Branch Railroad that the Products Company was acquiring from respondent as were evidenced by the reservation and exception clauses of the three deeds, Exhibit 'A', 'B' and 'C'. Accordingly, to meet the demands of this mortgagee, * * * negotia-

tions were conducted    \*   \*   \*. The culmination of these not informal or casual conferences and negotiations was the execution under date of January 29, 1929 of Exhibits 'K' and 'L'. It is appellants' position that these two instruments superseded and supplanted the reservations and exceptions of the easement or easements specified in the earlier deeds 'A', 'B' and 'C',    \*   \*   \*.''

The deed known as Exhibit K said:

"\*   \*   \* do hereby jointly and severally grant, bargain, sell and convey unto said Coos Bay Lumber Company,    \*   \*   \* a right-of-way for the construction, maintenance and operation of a standard gauge railroad on, over and across the following described lands.''

At that point the deed described, by resort to the terminology of surveyors and their measurements, the course of the logging railroad's right of way in Sections 7, 8, 9, 6 and 31. The description was succeeded by this language:

"\*   \*   \* together with the right to said company, its successors and assigns, to maintain and to alter and change the locatiton of said track and said right-of-way, to construct stubs, switches, and passing tracks    \*   \*   \* in connection therewith across said lands, upon payment only of the actual damage caused by such alterations, changes and additional construction to structures and growing crops of the grantors and also a right-of-way as now surveyed and staked out or as may hereafter be surveyed and selected by said company, its successors or assigns, for the extension of said railroad from its present terminus across the lands above described in Section 31.''

A provision of this deed, which the plaintiffs stress, reads:

"It is further specifically provided that said right-of-way and any rights-of-way used under the

terms hereof shall revert to and revest in the grantors upon the abandonment thereof by the grantee, its successors or assigns, and this shall apply to any and all portions or parts of said right-of-way."

The deed made no mention of roads, tramways, camp sites or similar facilities which are named in the clauses of deeds A, B and C which reserve rights to the defendant.

The plaintiffs argue that the deed K which has just had our attention "superseded, supplanted and limited" the three earlier deeds, A, B and C, in which the defendant reserved to itself right of way. The defendant-respondent says, concerning K:

"Respondent contends that Exhibit 'K' conconveyed nothing for the reason that the respondent already owned everything it purported to convey by reason of the reservations contained in Exs. 'A', 'B' and 'C'."

The parties to the paper known as Exhibit L, which purports to be an agreement, were the same as those mentioned in Exhibit K. Although it named Powers as "the second party", it made no provision for his signature, and he did not sign it. The instrument began with a recital of $10.00 as consideration and declared that in the construction of the railroad along Salmon Creek the defendant had rendered unusable a road which Powers had previously employed in going between two ranches which he owned and which are known as the Bigelow and Guerin ranches. The former is in Section 8 and the other in Section 31.

The paper declared:

"* * * until such time as the second party (Powers) shall be furnished either by the first

party (defendant) or otherwise, with an adequate road leading between said ranches and from the said Bigelow Ranch to the said town of Powers by reasonably direct route, the first party will allow the second party to travel between said points on its railroad with a speeder or similar light equipment.''

The instrument bound the defendant to haul for Powers, without charge, the products of his farms and his needed supplies. It further provided that the defendant should haul for Powers, at the rates mentioned in the paper, his timber products.

The plaintiffs' brief, as we have said, argues that the deed known as Exhibit K superseded the reservation clauses of Exhibits A, B and C, and that accordingly after January 29, 1929, (1) respondent had no right to deviate from the 100-foot right of way described in Exhibit K; and (2) ''by reason of respondent's abandonment in 1946 of that portion of the Salmon Creek Branch Railroad lying in Curry County and respondent's abandonment by 1950 of the balance of this right of way across the westerly section of appellants' lands, the entire right of way described in Exhibit 'K' had reverted to and become revested in appellants.'' The plaintiffs attach controlling importance to Exhibit K, as is evident from the following taken from their brief:

''If respondent's and the trial court's theory is correct, then all of appellants' contentions pertaining to the westerly section of this railroad right of way will have been urged in vain. On the other hand, if appellants' theory is correct and Exhibit 'K' is given virility and effectiveness, then the trial court committed obvious and patent error with respect to the right of way over the westerly section of appellants' property.''

The plaintiffs' brief argues that after the execution of Exhibits K and L, the parties, through their conduct, interpreted K and L to mean that

"the broad, indefinite and uncertain easement rights reserved and excepted in deeds 'A', 'B' and 'C' had been superseded and supplanted by the terms and provisions of Exhibit 'K', and that respondent no longer had any rights with respect to appellants' lands beyond the 100 foot strip described in Exhibit 'K'."

In advancing that proposition, the plaintiffs call attention to three other documents, each of a contractual nature, which were identified at the trial as Exhibits P, O and N. Exhibit P was signed February 20, 1934, by Powers and the Pacific White Cedar Company, which later changed its name to Port Orford Cedar Company. Exhibit O was signed April 23, 1936, by Powers and the Pacific White Cedar Company. Exhibit N bears date of January 28, 1939, and the signatures of Powers and the Port Orford Cedar Company. The corporation just mentioned was predecessor in interest of defendant.

For a maximum term of five years P leased to the Pacific White Cedar Company two acres in Section 31 which lay near the railroad right of way at an annual rental of $100 and granted to the lessee the right to use water from a creek which ran across the leased premises. This agreement declared that it should not affect or alter the terms of prior agreements made by Powers and the defendant with reference to trackages or rights of way. Exhibit O, which was signed April 23, 1936, granted to Pacific White Cedar Company (1) a right of way in Section 7 for the construction of a railroad spur 1000 feet long leading from the defendant's main track; (2) a right of way for

the construction of a logging road; (3) the right to build "a dam on what is known as Abbot Creek or any other suitable creek, so as to provide the second party with suitable and adequate water supply"; and (4) the use of needed space for log hauling and landing facilities. The instrument gave Powers the right to use the contemplated logging road, and granted to the defendant the right to purchase in the succeeding two-year period 300,000 feet of Powers' cedar timber at the price mentioned in the paper. Exhibit N operated for a period of ten years and provided for a consideration of $5,500, payable by the Port Orford Cedar Company to Powers. The first of its provisions granted to the Cedar Company a right of way extending from the west line of Section 31 "to the landing in Section 7" to be used for "logging, railroad and trucking purposes". It stipulated that the Cedar Company should have the right to construct "a road or roads adjacent to the present incline railroad and shall also have the right to use for said purposes the present roadway which runs approximately along the ridge on which said incline is at present located, all of the above being in Section 6 and 7 * * *." The instrument acknowledged in the Cedar Company the right to build a loading site "together with additional trackage to facilitate said loading and storage of cars". It granted the company the right to place "two or three cabins, roundhouse, etc." upon the properties, and recited: "* * * the present private road now adjacent to said incline will be used by the second party (Cedar Company), and that the second party shall forthwith widen said road, maintain necessary repairs thereto and properly gravel the same and put in necessary drains and culverts" and that upon completing

its work in that area the Cedar Company shall place the road in good condition for Powers' use. It added: "It being understood and agreed that said road is the only available and permanent road between the ranches of the first party (Powers)". The agreement bound the Cedar Company to permit Powers to use the logging railroad in the manner specified in the agreement of January 29, 1929, and required it to take measures so that its main line would not become "unnecessarily blocked", thereby rendering it difficult for Powers to use the line. The Cedar Products Company was also required to haul, at the rate specified in the agreement, any forest products which Powers offered.

Since N, O and P do not specify the location of the easements and other rights which they granted, and since no witness described the places where the roads and railroad spurs authorized by those instruments were built, we do not know where the areas which were affected by those instruments were situated.

The foregoing gives synopses of the deeds and contracts which, the plaintiffs contend, show that the defendant is a trespasser upon the contested right of way. It also gives the substance of the deeds and contracts which, the defendant claims, show that it is entitled to use the log truck road and that it still owns rights in the parts of the railroad right of way which it did not include in the truck road.

We shall now review the evidence which, the plaintiffs claim, shows that the defendant abandoned the easements in the railroad right of way. Although the plaintiffs deny that the defendant ever owned the fee in the right of way, they concede that it had an easement over its entire length. The plaintiffs argue that

when the defendant dismantled the railroad it abandoned the easements and the grant reverted to them. Their contention assumes the following two-fold character: (1) the defendant abandoned the railroad and thereupon its easements in the right of way terminated; (2) the easements in Sections 7, 8, 9, 6 and 31 reverted to the plaintiffs under the reversion clause of the deed (Exhibit K) which Powers, his wife and parents signed January 29, 1929, and which the plaintiffs claim "superseded" the broad reservation clause of deeds A, B and C.

The dismantling of the logging railroad occurred in two periods, separated from each other by a space of three years. In 1946 the defendant dismantled the part of the railroad which crossed Section 6 and extended for 200 feet into Section 31. In that year, as we shall show in greater detail when we review the evidence upon the issue of the alleged parol license, two officials of the defendant met Powers and one of his neighbors [Dement] in Section 6 and explained that the defendant wished to dismember the railroad in Sections 6 and 31 and replace it with a gravel road. The two officials were Al Smith, defendant's superintendent of logging, road building and railroad operations, and J. W. Forrester, defendant's manager and vice president. After Powers had given his assent to the plans, the railroad in Sections 6 and 31 was demolished and the gravel road was built. Since that time the defendant has had no railroad in those sections. The road which the defendant built in Section 6 is more than a mile in length and only one short part of it employs the old railroad right of way. So far as we can discern from the record, the defendant makes no use of the parts of the railroad right of way which it did not incorporate in the gravel road.

Following the dismantling of the railroad in Sections 6 and 31, Powers requested the defendant to give him a deed reconveying the right of way which the railroad had occupied. The request resulted in an exchange of correspondence. In its letters to Powers, the defendant employed such terms as "the abandoned railroad area", "the abandoned right-of-way" and "the abandoned railroad right-of-way".

Three years passed before the defendant discarded any more of its railroad. In 1949 it tore up the remaining parts of its railroad and then constructed the present log truck road. We shall now mention the parts of the logging railroad right of way which were not incorporated in the log truck road.

The entire length of the railroad right of way in Section 26 was converted into the roadbed of the log truck road, with the exception of a short piece which was a tunnel. A photograph of the new road, which shows one portal of the tunnel, is an exhibit before us and indicates that the deserted tunnel and the new road are upon different levels. The tunnel sustained a succession of cave-ins in 1949 and is now forsaken.

In Section 34 the railroad crossed a long stretch of lowland but avoided descent to its level by employing trestles. When the log truck road was built, a route was chosen upon higher ground about 350 feet northwesterly which paralleled the trestles. By constructing the log truck road upon the higher ground, the defendant was able to discard the trestles. Some of the photographs of the new road, which are exhibits, show remnants of the abandoned trestles. The latter appear to be dilapidated and worthless. Only a few hundred feet of the old logging railroad right of way in Section 34 has been incorporated in the log truck

road. The defendant makes no use of the parts of the trestles which remain standing nor of the ground under them. In Section 4 a somewhat similar situation is revealed by the evidence, but there the diversion from the old logging railroad right of way is short.

Officials of the defendant swore that neither they nor the defendant's board of directors has decided to abandon the railroad right of way. Evidently the defendant proposes to retain, not only the right of way employed by the log truck road, but also the parts of the railroad right of way which have not been incorporated in the road. Two of the officials indicated that when the defendant cuts the Sixes timber, it may decide to lay upon the present log truck road the rails and ties for a new logging railroad. Cost of operation will determine how the logs will be hauled out. The evidence indicates that tracks and ties can readily be laid upon the present log truck road. Al Smith, the defendant's superintendent, in speaking to that effect, said:

"It would only be necessary to lay ties and steel and add a little ballast to hold the road in place, to rebuild approximately eighty-five per cent of that railroad, and the bridges that would have to be rebuilt at that time could be built much easier now."

Presently, when the examination turned to the question as to whether the defendant proposed to maintain both a log truck road and a logging railroad, Smith testified:

"Q But if the occasion arose, when you got this road in, under your theory, you would have both roads available, whichever one you wanted to use?

"A Not at the same time. If we decided fifteen or twenty years from now to put in a railroad, then the trucking road would be stopped."

The defendant's work upon the log truck road had not been completed when this suit was filed. The plaintiffs have made no demands upon the defendant for a conveyance to them of the unused parts of the railroad right of way in Sections 4, 26 and 34 similar to the demand which they made for the segment in Section 6.

The above, we believe, constitutes a fair review of the evidence upon the subject of abandonment.

The only evidence which the plaintiffs presented showing that the log truck road may subject the servient estate to a use different from the former logging railroad consisted of Powers' testimony that log trucks cause dust and operate more frequently than log trains.

The appellants' brief says:

"* * * the use of logging trucks and log roads in the Northwest logging industry has, during the past 30 years or more, passed through an evolutionary development. As a result and present consequences of that development the supremacy of the logging railroad has practically been eliminated and the logging truck and logging road have taken its place. * * * This result has been brought about by pure economical consideration, the loggers having found it more economical to build logging roads than logging railroads."

We shall now review the evidence which the parties presented upon the issue which arose when the defendant averred that the plaintiffs granted it an irrevocable parol license to construct and use the log truck road.

A previous paragraph, which is concerned with the plaintiffs' claim that the defendant abandoned the part of the railroad right of way which it did not incorpo-

rate in the log truck road, mentions a meeting which occurred in 1946 in Section 6 between Powers, Dement, Smith and Forrester. The meeting was held before the defendant dismantled the railroad in Sections 6 and 31 and supplanted it with the present road. In Section 6 very little of the old railroad right of way was incorporated in the gravel road. It will be recalled that Smith, in describing the meeting which occurred in 1946, swore that in its course he and Forrester acquainted Powers fully with the defendant's plans for work in Sections 6 and 31. Before quoting Smith's description of the meeting, we explain that Mr. Lehmanowski, who is mentioned in Smith's testimony, was the defendant's engineer. We now quote Mr. Smith:

"As I remember it we took a car up on a speeder, took my company car up there, and we met Mr. Powers and Mr. Dement, and drove down over the road that was then in existence, and showed him the road that Mr. Lehmanowski had surveyed, more or less paralleling this road, from the divide down to the west line of Section 31, and Mr. Dement was with us, and we took him down and showed him the survey that we had made through some of his property below there, and we told him that we didn't know for sure when we would have to bring timber out of there but that we wanted to get this road built so that if we did we would have a way to truck timber to the end of the steel and Mr. Powers said go right ahead and build the road, and in fact several months after that when we did build the road, a month or so after, I met Mr. Powers and arranged to buy gravel from him down in Section 31, which we used to surface that road from its summit down to the end of the incline.

\* \* \*

"Q Was the road which you discussed with Mr. Powers, has the road been located and built on

the route that you discussed with Mr. Powers in 1946?

"A Yes.

\* \* \*

"Q What did he tell you as to what you might do there?

"A He told us to go ahead and build the road, that it was all right.

"Q Was there anything said to you by him at that time about you having the right to build a road there?

"A He talked to Mr. Forrester and I together, and exactly what his words were I don't remember.

"Q He told you to go ahead and build the road?

"A Yes.

"Q Did you build it in about 1946?

"A Yes, we built it in August and September of that year and rocked it with rock and gravel that we bought from him."

In testifying, Powers ignored the conversation which Smith related. He does not claim, as we will now show, that Smith's narrative of the meeting and conversation was inaccurate; to the contrary, appellants' brief says:

"In 1946, Mr. Powers and his neighbor Mr. Dement met with Mr. Smith, respondent's logging superintendent, and his superior, Mr. Forrester, respondent's general manager, and drove down over the road that traversed the Westerly section of appellant's property, that is, Sections 7 and 6, Township 32 South Range 12 West, and Section 31, Township 31 South, Range 12 West. Messrs. Forrester and Smith showed Mr. Powers the location of the road that Mr. Lehmanowsky—respondent's engineer—had surveyed, which more or less paralleled the existing road. \* \* \* Messrs. Smith and Forrester then explained to Mr. Powers that they—respondent—wanted to get this road built

so that they would have a way to truck timber to the end of the steel. At that time, although Mr. Smith could not remember what Mr. Powers' exact words were, Mr. Smith testified that Mr. Powers told them to go ahead and build the road. Pursuant to this oral understanding with Mr. Powers in 1946, they proceeded in that year to build the road, which they did in the months of August and September, 1946. They surfaced this road in September 1946 with the gravel bought from Mr. Powers, from the summit at the South quarter line of Section 6 down to the end of the incline which was several hundred feet below (south of) the North line of Section 6. This gravel was procured from Mr. Powers and used on this road  *  *  *.''

The appellants' brief, after giving the above-quoted account of the conversation which Powers and the defendant's representatives had, endeavors to avoid its effect by arguing that the defendant did not need Powers' consent to do the work in Section 6 which they wished to do. It says:

"Of course, respondent, Coos Bay Lumber Company, already had the legal right to build this very road beginning in Section 7, crossing Section 6 and ending on the West line of Section 31 under the express provisions of the agreement (Plf. Ex. 'N'), dated January 28, 1939 and not expiring until January 28, 1949 made between Albert H. Powers and Port Orford Cedar Company, to the latter's rights and obligations under which respondent had succeeded  *  *  *.''

A previous paragraph of this opinion quotes the parts of Exhibit N which are material. When N was signed in January of 1939 the defendant had not yet conceived an idea of supplanting the railroad with a log truck road and, hence, it seems reasonable to infer that the right granted by N to the defendant

was for the construction of some road other than the one which the defendant built after the 1946 conference. It must be remembered that the road which the defendant built in 1946 supplanted and did not augment the logging railroad which had been constructed many years previously. The road authorized by N was plainly intended to be one which would augment the logging railroad. For instance, N said:

"Said right of way to be used for logging, railroad and trucking purposes; * * * the second party (defendant) shall have the right to construct and maintain a convenient road or roads adjacent to the present incline railroad and shall also have the right to use for said purposes the present roadway which runs approximately along the ridge on which said incline is at present located."

Thus it is clear that the road which N authorized was to be an additional thoroughfare. Since the defendant has never claimed that deeds A, B and C reserved to it the right to cross the plaintiffs' land with more than one right of way, it obviously was required to obtain from the plaintiffs the right for an additional right of way, as it did through the medium of N, when in 1939 it wished to parallel its railroad with another road. Powers, as a witness, made no claim that the work which the defendant did in Section 6 in 1946 had already been authorized by Exhibit N. Although we have examined N with care, we have found no warrant in it for the plaintiffs' claim that the road which was built in 1946 emanated from the provisions of that document. We believe that the authority under which that road was built came from the 1946 conference.

After the aforementioned work in Sections 6 and 31 had been completed in 1946, the defendant per-

formed no more reconstruction work until 1949. However, in 1947 the defendant's engineer, Lehmanowski, prepared plans for extending the Salmon Creek route directly into the defendant's Sixes timber, and the defendant's board of directors adopted the plan. Partly in fulfillment of that plan, the defendant built a road into the timber. Other action upon the plan was deferred.

We shall now describe the work which was done in 1949 and the conferences which preceded it.

The cave-in which occurred in the tunnel June 15, 1949, confronted the defendant with the problem of providing Powers and itself with a means of traveling between the town of Powers and the area easterly of the tunnel. It will be remembered that the contract known as Exhibit L, which was signed January 29, 1949, contains this provision:

"* * * until such time as the second party (Powers) shall be furnished either by the first party (defendant) or otherwise, with an adequate road leading between said ranches and from the said Bigelow Ranch to the said town of Powers by reasonably direct route, the first party will allow the second party to travel between said points on its railroad with a speeder * * *."

Although that provision appears to do no more than grant a permission, the appellants' brief says:

"Respondent was obligated, under the provisions of Exhibit 'L' to construct an all-year road into Powers and to gravel it * * *."

Referring to Powers, the brief continues:

"He was legally entitled, under the terms and by virtue of Exhibits 'L' and 'K' to have this road built."

We can find in L and K no warrant for those claims.

In making that statement, we did not overlook the provisions of L which required the defendant's railroad to accept Powers' shipments.

When the cave-in occurred and efforts to remedy it proved futile, Smith and Forrester conferred for the purpose of determining how the defendant could provide access to the area beyond the tunnel for the avail of both the defendant and Powers. We shall not pause upon the expedients to which the men resorted in order to afford the plaintiff an immediate means of travel between his ranches and the town of Powers, but will go on to the efforts which they made to gain for him and the defendant a road which both could use.

July 15, 1949, a conference was held between Powers and the above-named officials. It was the first of those upon which the defendant depends to establish the alleged irrevocable parol license. The three met at Broadbent and then drove over some nearby roads in an effort to find a route which, if improved, would satisfy the needs. The search seemed to indicate that a route leading from one of the plaintiffs' ranches, the Gaylord, and down a stream known as Roland Creek might suffice. Powers freely conceded that the conference was held and that Roland Creek appeared to be suitable to the defendant's purposes as well as his.

A day or two after the conference just mentioned, Smith flew over Roland Creek and had the defendant's engineer, Lehmanowski, gather data concerning that route, with the result that Smith became satisfied that the Roland Creek route was impracticable. He acquainted Powers with his views. Smith and Forrester then held more conferences, resulting in a decision that the best solution of the problem was to dismantle the logging railroad and supplant it with a gravel road.

Efforts to locate Powers and acquaint him with the decision were presently unsuccessful. Smith believed that, since the work would have to be completed before the winter rains began, he should proceed at once with the undertaking, and on August 8 the work of dismantling the railroad got under way. The defendant put in charge of the job and of the construction of the new road a young engineer by the name of Robert K. Cline. Before the latter began the work he and Smith studied the area and concluded that some parts of the railroad right of way, such as the long trestle in Section 34, should not be included in the new road and that the latter in that section should be built upon the higher ground a few hundred feet northwest of the trestle.

"A day or two" after Cline's crew began to tear up the ties and trestles, so Smith swore, he encountered Powers at the Bigelow ranch and related to him the changes which the defendant proposed to make. Powers, as a witness, admitted that the meeting occurred and that Smith at that time explained to him his plans.

Smith testified that when he acquainted Powers with his construction program, he did not doubt the defendant's right to build the gravel road and, in places like Sections 26, 34 and 4, to change the existing route, but that he believed that the defendant would be liable for any injury that the change might inflict upon the plaintiffs' crops and buildings. He was anxious, so he testified, to avoid unnecessary injury and, therefore, conferred with Powers. Upon that subject, he continued as follows:

"Q Then you asked just as a matter of courtesy?

"A I asked as a matter of courtesy and told

him that I wanted to get the by-pass road into place where it would not damage him, if possible.''

Smith told Powers in the course of the visit at the Bigelow ranch, according to the undisputed testimony, that the defendant had decided to dismantle the railroad and to supplant it with a gravel road which, in Sections 26, 4 and 34, would depart from the railroad right of way. Smith's words were:

"I talked at some length with Mr. Powers about each one of these digressions where we got off of the railroad right of way.''

He particularly described to Powers the work in Section 34 where he planned to abandon the trestles by constructing the new road upon the higher land which lay northwesterly. Smith swore that Powers acquiesced in the proposals to supplant the logging road and to employ a new route at the places which he (Smith) mentioned; that is in Sections 26, 34 and 4. According to him, Powers even "made one suggestion up at the bend, we had a trestle above the sidetrack on the line between 7 and 8 and he suggested that we move off the right of way and go around the foot of the hill.'' Going on, Smith testified:

"I described this route to him thoroughly and asked him whether that would be suitable to him to take this road around there, and he said it certainly would. I asked him if there would be any damages that we would have to pay, and he said not as long as we didn't fill up the creek or change the course of the creek or do something of that sort. * * * He told me at that time that as far as he knew the Coos Bay Lumber Company had a right to go over and cross any part of the property that he owned in the Salmon Creek area and Eckley area, as long as we paid for any damage to crops or anything else that we might bring about.''

In the course of their conversation, according to Smith, he told Powers of Lehmanowski's plan that the defendant had adopted for bringing the Sixes timber over the Salmon Creek route into the town of Powers and of the road which had been built from Section 31 into the Sixes timber. He claims that he made it clear that the defendant intended to bring its Sixes logs over the Salmon Creek route. Powers was reminded, according to Smith, that the defendant might not cut the Sixes timber for 15 to 25 years. Smith claims that he told Powers that when the Sixes timber was cut it might be brought out upon rails laid upon the gravel road which the defendant was about to build. The following is taken from his testimony:

"Q Now, was there any discussion at that time about the future use of this railroad right of way by the Coos Bay Lumber Company?

"A Yes.

"Q What was said at that time?

"A As near as I can remember, Mr. Powers asked if we figured on hauling logs over this route and I told him I didn't know for sure because we didn't have any idea of logging the Sixes timber for maybe fifteen or twenty or twenty-five years, and that—

"Q This was in 1949?

"A Yes.

"Q All right—

"A But that looking in the future, we would either want to use this road as a truck road or rebuild the railroad to get the Sixes timber out when we went in there."

Smith was positive that he told Powers that the defendant intended to bring out the Sixes logs over the Salmon Creek route and that the only uncertainties were time and the precise means of transportation.

The ensuing quoted statement acquainted Powers with the immediate use to which the defendant proposed to put the road:

"I told him that we intended to use that road for the supervision of our track, going back and forth over it, fire protection, and anything else that would be necessary to do down there, in the Sixes country, that we would use the road to go back and forth, and he offered no objection whatever."

In explaining the defendant's project to Powers, Smith said that he told Powers that for the present the road would be of the access type, but that it would be built so that it could be widened and strengthened when the defendant was ready to haul logs upon it. He swore that Powers at no time intimated that the defendant lacked the right to do the contemplated work or resort to the digressions which it employed. To the contrary, according to him, Powers told him more than once that the defendant could lawfully digress from the railroad right of way, provided it paid him for injuries to his crops and buildings. He swore that Powers told him to go ahead and build the road.

After the conference just mentioned, the road was built and was ready for use September 25, 1949. Evidently the task of converting the railroad right of way into a gravel road was extensive, for Powers, as a witness, mentioned "a tremendous amount of yardage, a good many thousands of yards of rock and dirt". It will be noticed that hardly anything had been done toward converting the railroad right of way into the road before Smith and Powers had their conference.

Smith swore that in the course of their conversation he and Powers agreed that gates and locks should be placed at the terminals of the road so that they

could restrict its use to those whom they chose, and that they agreed that keys should be given to Powers, the defendant, the State Police and the Forestry Service.

The appellants' brief freely concedes that the conference which Smith described took place. In fact, it quotes parts of Smith's testimony in which he described to Powers the contemplated deviations from the railroad right of way. The quotations are not accompanied with any intimations that Smith's testimony should be rejected as unreliable.

Concerning the above conversation, that is, the one which Smith and Powers had a day or two after Cline began to dismantle the railroad, Powers testified:

"Al Smith came to me somewheres about two weeks after they started tearing up the track, and he said you own Section 34, don't you, and I said yes, I think I do. He said what do you feel about our going around the trestles and getting over against the bank with the road. I said what are you talking about, a fire road or an inspection road, or one to haul logs over. I had been told by Mr. Smith and Mr. Forrester in July that they didn't intend to log out therefor twenty or twenty-five years. So when they changed their plans I knew nothing of their change of plans officially until Mr. Smith came to me, when I presume they were down at Section 34 with there tearing up, and what I told him, I told him it would be all right to put it around there for inspection purposes and for fire. Naturally, as a director of the Coos County Fire Patrol and as a member of the Board of Forestry for sixteen years, I wasn't going to tell him not to put a fire road in there.

"Q Did you consent to the building of a logging road there?

"A No."

The foregoing is all of the testimony which Powers gave concerning the conversation which he and Smith had at the Bigelow ranch shortly after Cline began to dismantle the railroad. Powers made no other reference to that conversation. It will be noticed that Powers freely conceded that he authorized the defendant to ''go around the trestles'' and ''get over against the bank'' in constructing the new road. In other words, he authorized the defendant to do the very thing which it did; that is, abandon the trestles and construct the new road upon the higher ground several hundred feet northwest of the trestles. It will also be noticed that Powers challenged none of Smith's testimony in which Smith had sworn that (1) he had fully described to Powers the defendant's plans for the reconstruction work; (2) had told Powers that the defendant intended to bring the Sixes logs to the town of Powers over the Salmon Creek route; (3) Powers told him that the defendant had a right to cross his land with the road, subject only to liability for injury to his crops or buildings; and (4) Powers told him that the defendant could rightfully digress from the railroad right of way, provided it compensated him for injuries inflicted upon his crops or buildings.

Mr. Cline swore that, as his construction work was under way in Section 34, he had a conversation with Powers concerning it. In its course he pointed out to Powers, so Cline claimed, a turn in the new road and suggested that if Powers would authorize him to cut down a growth of alder trees that stood ahead, the turn could be improved. Consent was given, so Cline testified, who added that Powers made no objections whatever to the work that was under way or the route that had been selected. As a witness, Powers ignored the conversation which Cline had detailed, except to

testify that he felt it was not incumbent upon him to make objections to the work.

Sometime in August Smith had another conversation with Powers about the new road. In it he purchased from Powers gravel for surfacing the roadway.

Thus, we see that in 1949 Powers and representatives of the defendant held three conversations about the new road. The first occurred immediately after Cline began to tear up ties and rails. Powers' contradiction of Smith's account of that conversation was confined to "No", that he never consented to a logging road. The second conversation was between Powers and Cline. It was ignored by Powers, unless his general statement that he did not feel obliged to object to the work underway took cognizance of Cline's testimony. The third conversation was the one in which Smith, on behalf of the defendant, purchased from Powers the gravel with which the road was surfaced. Powers does not deny that he made the sale and accepted the purchase money.

As we have said, the new road was completed by the latter part of September, 1949. Thereupon Powers used it. The record indicates that he hauled upon it many truck loads of cattle.

In 1950 the road was widened and improved into its present state. Preceding that work and in its course more conversations were held between Powers and representatives of the defendant. The latter cites statements made in them by Powers as further support of its alleged parol license. Before taking note of them, it is necessary to mention a development which preceded the conversations.

In the spring of 1950 the Forestry Service offered for sale a tract of Government owned timber located

in the Sixes area known as the Otter Creek timber. It contained 14 million feet. Stands owned by the defendant were adjacent to the offering of the Forestry Service and, since the defendant did not wish to have its holdings endangered by the hazards attendant upon the operations of some itinerant logger who might purchase the Government offering, it made the purchase itself. The terms of sale required the purchaser to complete the logging in two years. Defendant made the purchase June 20, 1950. With the acquisition of this timber, the defendant concluded that the best and cheapest way to bring the logs to its facilities in the town of Powers was to truck them over the road which it had constructed in the preceding summer. However, before the road could accommodate the log trucks which would be needed to bring the Otter Creek logs to Powers, it would have to be widened and its bridges strengthened.

When Smith and Forrester contemplated the improvement of the Salmon Creek road, which the defendant built the preceding summer, so that they could bring the Otter Creek logs to the town of Powers, they were disturbed by a letter written by Powers April 9, 1950, which reads as follows:

"Two weeks ago today I wrote to Mr. J. W. Forrester concerning return of the deed to right of way—abandoned at Eckley—in accordance with original deed to this strip of ground, to the Port Orford Cedar Products Co. I have received neither deed or acknowledgment. * * * I wish to call this to your attention. May I have a prompt reply."

Forrester, on behalf of the defendant, had answered that letter and another of like kind by a letter which stated, in part:

"You are advised that Coos Bay Lumber Com-

pany has never intended to abandon or give up the right of way granted in that deed and has not abandoned the right of way, and does not intend to abandon the same in the future.

"We cannot help but feel that there is some element not specifically brought out in your request for return of deeds that we do not understand, * * *."

In truth, as the appellants' brief concedes, Powers possessed no deed calling for a reconveyance of right of way, whether abandoned or otherwise. The brief attributes Powers' request for a reconveyance to an inadvertent error upon his part.

The exchange of letters of which we have taken notice convinced Forrester and Smith that they should ascertain Powers' attitude before the defendant undertook to widen and strengthen the road which the defendant built in the preceding summer. Evidently they did not care to spend more money upon the road at that time if to do so would precipitate litigation, and they were especially anxious to make certain of a road which they could use before winter to bring out the Otter Creek logs. Smith, in describing the situation, testified:

"In talking this over, well, in bringing out this Sixes timber, we knew that we couldn't get started building on this road, rebuilding the road from Powers to the Sixes timber, into a good winter truck road, we knew we could hardly have time to do it before the winter rains came on, and if that route wasn't possible, if we couldn't get that road ready from Powers down to Otter Creek if we couldn't get that road ready we would have to work in improving the county road down Sixes, to bring that timber out that winter, down the Sixes, so Mr. Forrester told me—we talked about this letter from Mr. Powers, and his reply, and he told

me before we did any work on the road to talk to Mr. Powers and find out for certain whether Mr. Powers thought we didn't have a right to use that road, and—

"Q That is the road up Salmon Creek and up to the Curry County line?

"A Yes.

"Q All right—

"A Before we ever started any work at all, because if there was any litigation on account of using this road, if Mr. Powers would try to stop us, it would be too late then to make a very good road on down the Sixes River from Otter Creek to Highway 101. So he asked me to talk to Mr. Powers about it and see if he thought he had anything further coming and whether he, well, to make sure that Mr. Powers thought that we had the right to use that Salmon Creek road as a truck road before we started improving it."

The "county road down Sixes" to which Smith referred is one which we described in a preceding paragraph. We there said that it led through Section 31 and down the Sixes River to the Coast Highway. Although it is a public thoroughfare, it needed widening and graveling before it could accommodate log trucks. It is more than twenty miles long.

As a result of the desire of Smith and Forrester to ascertain Powers' views, Smith called upon Powers June 24, 1950, in Powers' hay field at his Gaylord ranch. We now quote from Smith's testimony:

"I asked Mr. Powers about this letter and what he meant by it, whether he thought that the Coos Bay Lumber Company didn't have the right to truck logs from the Salmon Creek road, and he said definitely that the Coos Bay Lumber Company had a right to truck roads over any of his property, that we had reserved that right years before."

Still relating what was said during the conference, Smith testified:

"A I told Mr. Powers that the Company had bought this timber, and

"Q Did you say how much timber?

"A I can't say, but I suppose I did.

"Q How much timber was there, on this property?

"A Fourteen million feet.

"Q All right—

"A I explained to him that we planned to haul it out, most of it, that winter, and that we wanted to complete the road up Salmon Creek and down the Sixes to bring the timber in that way as a winter road.

"Q As a winter road?

"A Yes.

"Q That is the first time you ever mentioned using that road as a log trucking road?

"A That is the only time I knew we were going to use it on a certain date."

Upon his cross-examination of Smith, plaintiffs' counsel inquired of him at length as to the time or occasion that he informed Powers that the new road would be used for log hauling. We shall now quote from a part of that interrogation. To facilitate an understanding of it, we mention that we begin our quotation at a point where Smith and plaintiffs' counsel had been concerned with the conference that occurred June 24, 1950.

"Q When is the first time you told him you were going to use it as a truck road?

"A The year before I told him that I didn't know for sure whether we would rebuild the railroad or not, or use it as a trucking road, but that

we wanted to lay it out in such a way that it could be used as a trucking road when we used it.

"Q When was that?

"A In 1949 I told him that. In 1946 we talked about the road around the incline. I told him that this road, in 1946, that we were changing the alignment—* * *

"Q When before that had you told him that you were going to use that as a log trucking road?

"A I just answered that.

"Q When, in 1946?

"A In 1946, and in 1949.

"Q In 1949?

"A I told him I didn't know when we would use it, or whether we would use the railroad instead of it, but I told him we were fixing it up so it could be used for trucking logs, locating it in such a way, I mean.

* * *

"Q Had you determined the year before to truck them instead of using the railroad?

"A I told him we were going to bring those out with a railroad or by truck road."

Thus, Smith swore repeatedly that in the conversations which were held in 1946 and 1949, as well as in the one on June 24, 1950, he told Powers that the defendant intended to bring the Sixes log to market over the Salmon Creek route.

Smith testified that in the course of their visit on June 24, 1950, he explained to Powers the plans which the defendant had adopted for widening the Salmon Creek road and strengthening its bridges. Then he gave the following testimony:

"Q When you told him that, did he agree that you might do so?

"A Yes.

"Q What did he say?

"A He said anything to make a better road through there is all right with him."

According to further testimony which Smith gave, Powers told him that he (Powers) did not question the defendant's right to use and improve the Salmon Creek road. The parts of Smith's testimony which we have left unmentioned were concerned with Powers' desire to receive a deed extinguishing the defendant's rights in the parts of the railroad right of way in Section 6 which the defendant was no longer using, and with expressions of surprise that the defendant intended to engage in 1950 in logging in the Sixes area when it had previously predicted that it might not do so for ten or twenty-five years.

July 15, 1950, Smith and Powers had another conversation. It resulted from a request by Powers, and occurred at a place known as Hoffman Bridge. Powers began the conversation by telling Smith that, since the defendant was no longer using parts of the railroad right of way, a reconveyance should be made and that Forrester should call upon him rather than expect him to call upon Forrester. Prior to that conversation, Smith had unsuccessfully tried to effect a meeting between Powers and Forrester. In the course of the conversation of July 15, Smith told Powers, so Smith testified, that the defendant had decided to bring the Otter Creek logs to the town of Powers over the Salmon Creek road. We take the following from his testimony:

"A So I again asked him if he doubted that we had the rights to use that road, and he told me no. I told him we were going ahead with the road and he said that his idea of getting the deeds to the property was not to stop us at all, to go right ahead.

"Q He told you to go ahead?
"A Yes.
"Q Did you go ahead?
"A Yes."

About August 1 Smith again spoke to Powers about the Salmon Creek road. The conversation was brief and was concerned with the purchase by the defendant from Powers of gravel for the widened roadway. The purchase was made and the defendant paid Powers for the gravel.

The appellants' reply brief admits that all three conversations were held. It acknowledges that Smith correctly described the times and places where the first two took place and that the third was a telephone conversation.

The following is the sole reference which Powers, as a witness, made to the three foregoing conversations which Smith described:

"Q In 1950 you had a conversation with Mr. Smith in your hay field?
"A Yes.
"Q Do you recollect that?
"A Yes.
"Q He brought up this subject at that time of building a logging truck road there?
"A Yes.
"Q Is that right?
"A Yes.
"Q What did you say to him in regard to that?
"A I was very much surprised when he approached the subject of a logging road down Salmon Creek, I naturally figured it was something that would occur twenty or twenty-five years in the future. I told him that I thought first things should come first, that I had had legal advice about my

contracts and that I should have the deed back on the right of way. I had tried from 1946 on, by writing letters to Mr. Dashney and some to Mr. Forrester, to try and get them to live up to that part of the agreement that I had made with Mr. Bunker. I felt that it was high time when the railroad was pulled up all the way into Powers, that they deliver that deed to me. When they didn't respond to my letters I sought counsel. I saw Mr. Skipworth in Coos Bay originally; he talked to Mr. Bedingfield about it, I believe. That would have been about December or January, about December, 1949, to the best of my recollection. Mr. Skipworth advised me that Mr. Bedingfield had said that I didn't have any rights for this land back, so when I wrote the letters again in March and April to Mr. Dashney and Mr. Forrester I wanted to get a definite answer out of them so I would know how I would have to proceed, and finally Mr. Forrester's letter was very definite that they had no intention of returning the land to me or giving up any of their rights. At about that time I took the contracts and deeds and so forth to Mr. McCulloch for advice.

"Q Did you ever consent to their building a logging truck road over that land?

"A Down Salmon Creek?

"Q Yes.

"A No."

We notice from Powers' scant reference to the three conversations which he had with Smith in 1950 that he did not deny that (1) Smith informed him of the defendant's purchase of the Otter Creek timber; (2) Smith told him that the defendant planned to haul the Otter Creek logs to the town of Powers over the Salmon Creek road; (3) he was acquainted by Smith with the defendant's plan to widen, improve and strengthen the Salmon Creek road built by the defendant in the pre-

ceding year, so that the defendant's log trucks could use it; (4) Smith informed him in 1946, 1949 and 1950 that the defendant would haul its Sixes logs over the Salmon Creek route; (5) he told Smith to go ahead with its plans for the Salmon Creek road, adding "anything to make a better road through there is all right with him"; and (6) he acknowledged to Smith that the defendant had the right to use and improve the Salmon Creek route.

August 6, 1950, the defendant began to widen and improve the road which it built the preceding year. The work consisted of making the graveled surface of the road not less than 25 feet wide, of strengthening the bridges and of moving the fences. Both Smith and Forrester swore that in pursuing the undertaking they depended and relied upon the assurances and representations which Powers had made and which are summarized in preceding paragraphs.

Evidently the defendant pursued the work with diligence, for we observe that Smith mentioned three "cats" which he brought to the road, a "shovel", many dump trucks and a crew of men. The first of the "cast" began operations August 6, the second August 8, and the third August 12.

The defendant contends that in converting the railroad right of way into the present two-lane gravel road it spent $65,476.59 up to the day of the trial. Work was still in progress at that time, although its scope may have been inconsiderable. The defendant claims that all of its expenditures were made in reliance upon Powers' representations and assurances that the defendant had a right to take its intended course of action and that he had no objections.

The defendant deems that the right of way through

the plaintiffs' 8000-acre ranch, approximately ten miles in length, is worth $10,000. The latter sum, together with the aforementioned expenditure of $65,476.59, indicates that the road is worth perhaps $75,000.

Under date of August 28, 1950, plaintiffs' counsel wrote a letter to the defendant which was based upon the deed of January 30, 1929 (Exhibit K) and the contract of the same date (Exhibit L). It insisted that the defendant's rights in the plaintiffs' property were limited to the privilege of maintaining nothing other than "a standard gauge railroad on, over and across" it. The letter declared that, since the railroad had been dismantled, the defendant's right of way "has reverted to the grantors" and the defendant's activities in widening and improving the road consisted of "little more than naked trespass". The letter demanded that the defendant desist from its activities. Smith, referring to the letter and to the work which he had done upon the road, declared that before receipt of the letter "the road was practically completed from the Bigelow ranch down to Section 31."

The record clearly warrants a finding that the road which the defendant built is of significant value to Powers. The segment which leads from the plaintiffs' Bigelow ranch to the town of Powers and the other which connects the Bigelow ranch with the Guerin ranch, also owned by the plaintiffs, are admittedly of material service to the plaintiffs. As soon as the road was ready for traffic, the plaintiffs proceeded to use it. As a witness, Powers said that before long his reforestation lands will offer a crop and, hence, it is reasonable to infer that when that time comes the value of the road to the plaintiffs will be enhanced. In all likelihood, this broad, well-constructed and well-

drained road adds materially to the value of the plaintiffs' land.

The above, we believe, constitutes a fair summary of the evidence. It is lengthy, but the facts had to be garnered from many sources. We close this review of the record by quoting the following from the memorandum opinion of the trial judge, which gives insight into his reaction to parts of the facts of which we have taken notice:

> "It seems almost preposterous to believe that the Coos Bay Lumber Company, or its predecessors in interest, would for a small price per acre sell valuable range lands and at the same time and for the same consideration give up valuable rights of way and the only feasible right of way to hundreds of millions of feet of valuable timber."

The first assignment of error charges that the circuit court erred in holding that the defendant "on and subsequent to April 14, 1945, was and is the owner of an easement and right of way to construct, maintain and use a log trucking road upon, over and along a 100 foot strip of land across" Sections 8, 7, 6 and the NW ¼ of the NW ¼ of Section 9 "as set out in paragraphs 2 and 3" of the challenged decree. The part of the plaintiffs' land affected by this assignment of error is the westerly section.

In arguing in support of that assignment of error, plaintiffs' brief says that "the broad, indefinite and uncertain easements excepted and reserved to respondent" in the deeds which the trial court identified as A, B and C "were subsequently superseded, supplanted and limited" by the deed known as K and the agreement marked L.

██ It is well at this point to take notice of the effect of the reservation clause in a deed. The effect was stated succinctly in *Beck v. Lane County,* 141 Or 580, 18 P2d 594, as follows:

"" * * The reservation of an easement in a deed carves a new estate out of that granted and is therefore to be construed as a regrant or reconveyance of the estate so reserved."

Therefore, it is our duty to treat the easement under scrutiny, if such was the nature of the right of way, as though the defendant possessed a deed which granted the easement to it.

It will be recalled that both K and L were signed January 29, 1929, and that the defendant, fourteen years or more prior to that time, through the reservations contained in Deeds A, B and C, created the easement in the property now owned by the plaintiffs, which the parties deem the westerly section. Some years prior to the execution of deeds A, B and C, the defendant had constructed its logging railroad and had thereby established upon the ground the location of the easement which deeds A, B and C reserved. Notwithstanding the fact that the situs of the easement was thus certain, an examination of the deed records would reveal no indication of its location. It was under those circumstances that the Chicago bank, which in January, 1949, was about to become a mortgagee of the properties, incidental to the purchase by the Port Orford Cedar Products Company, required that a deed be executed describing the location of the easement. It must be borne in mind that we are now speaking of the easement in the westerly section. Deed I, which created the easement in the easterly section, described its course specifically.

If deed K "superseded, supplanted and limited" deeds A, B, and C, then it not only put in writing a description of the situs of the easement reserved by A, B and C, but, through its acceptance by the defendant (January 29, 1929), extinguished valuable rights which the defendant up to that time had possessed. For example, deed A reserved to the grantor "the right at any time to establish  *  *  *  a road or roads, railroad or railroads, tramway or tramways, of any kind or character", but deed K spoke only of "a right-of-way for the construction, maintenance and operation of a standard gauge railroad". It made no provision for roads and tramways. Further, deed A reserved to the grantor a right to establish such adjuncts of logging operations as camps and railroad stations, but K mentioned no rights of a corresponding kind. Finally, as we stated in a preceding paragraph, A, B and C contained no clause whereby, through non-user, the easements would revert to the servient estate, but K said:

"Said right-of-way and any rights-of-way used under the terms hereof shall revert to and revest in the grantors upon the abandonment thereof by the grantee  *  *  *  and this shall apply to any and all portions or parts of said right-of-way."

From the above, it will be seen that if this assignment of error is sustained, the acceptance of K by the defendant (1) limited defendant's easements over the part of plaintiffs' land known as the westerly section to the exact course upon which the defendant had built the roadbed of its railroad; (2) surrendered the defendant's right to build and maintain roads, tramways, logging camps, railroad stations, etc.; and (3) constituted an agreement upon the defendant's part

that upon its abandonment of the railroad the easements should revert to the owner of the servient estate.

By reverting to the facts which we have mentioned, it will be observed that the deed known as K, which purported to grant to the defendant an easement for a railroad right of way in the westerly section, conveyed to the defendant nothing which any of the grantors owned and nothing which the defendant did not already own. That deed undertook to grant to the defendant an easement for the right of way upon which the defendant had constructed, twelve years or so previously, its railroad. For twelve years or more the defendant had owned and used that very easement by virtue of the reservation clauses in deeds A, B and C which bore the defendant's signature.

There is no contention that when deed K was executed the defendant was not the owner of the easement which K described. In truth, the subject matter of K was rights materially less in scope than those which the defendant had reserved to itself twelve years previously when it executed deeds A, B and C. Since the three deeds just mentioned had reserved to the defendant the easement for the right of way which was later described in deed K, the defendant was the owner of those rights and, therefore, neither Powers, his parents nor his wife owned them. That being true, no member of that group could convey them to the defendant. Thus, we see that deed K purported to grant something to the defendant which the latter already owned and in which the grantors had no title whatever. Moreover, the subject matter of K was an easement far less in scope than the defendant already held.

Now, let us examine the agreement entitled L, the companion document of K. It purported to impose

upon the defendant burdensome duties which it previously had not undertaken; that is, to permit Powers to use, free of charge, for the purposes designated in the instrument, the defendant's railroad unless some other means of access came to the avail of Powers. The instrument recited a consideration of $10.00. The defendant does not seek to be relieved of the duties which it took upon itself when it signed L, and we alluded to the latter only because the plaintiffs mentioned it when they endeavored to show consideration for K. We shall now take notice of the consideration for K and L. Only Powers was examined upon that subject; he gave the following testimony:

"Q I hand you Plaintiff's Exhibit L, which is a contract from Coos Bay Lumber Company to you, where they say they will furnish you certain transportation and do certain things for you, which is dated January 29, 1929—

"A Yes.

"Q And Plaintiff's Exhibit K, a deed dated January 29, 1929, from yourself and wife and your father and mother, to Coos Bay Lumber Company, whereby you convey them certain easements or rights of railroad, railroad right of way, across the colored portions of this map, Plaintiff's Exhibit M—

"A Yes.

"Q Now, my questions is this, did you pay Coos Bay Lumber Company anything for the contract, Plaintiff's Exhibit L, other than the execution of the deed, Plaintiff's Exhibit K?

"A I guess this is my dumb day, I still don't get what you are asking.

"Q What did you get for the right of way?

"A I got the right to move timber products off my land, to move farm stuff in and out, and I was freed from paying taxes on the land that I deeded to them. Other than that, I can't think of anything.

"Q In other words, you just traded the deed for the contract?

"A Yes—

"Q Is that correct?

"A Yes."

The foregoing testimony given by Powers is undisputed. According to it, the consideration for K and L were the two papers themselves. As we have seen, K brought to the defendant nothing which it did not already own and possess. Agreement L imposed upon it burdens which it previously had not assumed. It exacted of Powers nothing. Obviously, the one paper could not have been consideration for the other. Both K and L contained recitals of $10.00 as consideration. Seemingly, the one sum canceled out the other. Although the circumstances require us to hold that the two papers are supported by valuable consideration, the latter was nominal. We took notice of Powers' testimony, not for the purpose of defeating the validity of either paper, but only to reach a basis for interpreting them. As the plaintiffs pointed out, K was executed concurrently with the sale of the defendant's property to satisfy the demands of the prospective mortgagee for an instrument which could be recorded containing a description of the course of the easement.

In *Jennison v. Walker,* 77 Mass 423, the court said:
"* * * Where an easement in land is granted in general terms, without giving definite location and description to it, so that the part of the land over which the right is to be exercised cannot be definitely ascertained, the grantee does not thereby acquire a right to use the servient estate without limitation as to the place or mode in which the easement is to be enjoyed. When the right granted has been once exercised in a fixed and defined course, with the full acquiescence and consent of

both parties, it cannot be changed at the pleasure of the grantee. If it be admitted that he has the right originally to select the place in which the easement is to be enjoyed, he cannot afterwards alter it. Convenience and justice both require this limitation on the right; otherwise, it would be open to questions of great doubt and difficulty, and would make the servient estate in great measure subject to the unrestrained control of the owner of the easement."

*Cullison v. Hotel Seaside, Inc.*, 126 Or 18, 268 P 758, says:

"It will be noticed that the easement granted by the deeds to plaintiffs and their predecessors is couched in general terms and is somewhat ambiguous. Where an easement in land is granted in general terms, without giving definite location and description to it, so that the part of land over which the right is to be exercised cannot be definitely ascertained, the grantee does not thereby acquire a right to use the servient estate without limitation as to the place or mode in which the easement is to be enjoyed. But the location may be subsequently fixed by an express agreement of the parties, or by an implied agreement arising out of the use of a particular way by the grantee and acquiescence on the part of the grantor, provided the way is located within the boundaries of the land over which the right is granted. In other words, it is a familiar rule that when a right of way is granted without defined limits, the practical location and use of such way by the grantee under his deed acquiesed in for a long time, by the grantor, will operate to fix the location, where the intention is not fairly expressed in the terms of the grant controlling the future location: 19 C. J., p. 972, § 213.

"It is stated by Mr. Justice McBride in Patterson v. Chambers Power Co., 81 Or. 328, 341 (159 Pac. 568), '* * * it has always been the law that where there is an indefinite grant of an easement

of this character, with nothing to indicate that it may be changed or enlarged in the future, the first location and user fixes the limits of the grant.' See, also, Salem C. F. Mills Co. v. Stayton W. & D. Co. (C.C.), 33 Fed. 146, 148.''

The same principle was employed in *Beck v. Lane County,* supra, where it was stated:

"* * * It is well settled that where an easement in land is granted in general terms without giving definite location, the location may be subsequently fixed by an implied agreement arising out of the use of a particular way by the grantee and acquiescence on the part of the grantor for a long time. Cullison v. Hotel Seaside, Inc., 126 Or. 18, (268 P. 758); Patterson v. Chambers Power Co., 81 Or. 328 (159 P. 568); 19 C. J. 972, § 213. This rule is usually applied to the location of the easement as to its lateral situation.''

■ We believe that the purpose of deed K was to describe in writing for the avail of the deed records the location of the easement which the defendant reserved to itself when it executed deeds A, B and C, and which became fixed when the defendant built the logging railroad and proceeded with the operation of its trains. We come now directly to the plaintiffs' contention that the defendant's acceptance of deed K constituted a waiver by it of the easement to build and maintain roads, tramways, camp buildings and railroad stations which it reserved to itself in deeds A, B and C.

"An easement is an interest in land" according to *Tusi v. Jacobsen,* 134 Or 505, 293 P 587, 293 P 939. See, to the same effect, § 450 Restatement of the Law, Property.

Section 2-905, OCLA, says:

"No estate or interest in real propery, other than a lease for term not exceeding one year, nor any

trust or power concerning such property, can be created, transferred, or declared otherwise than by operation of law, or by a conveyance or other instrument in writing, subscribed by the party creating, transferring or declaring the same, * * *."

*Tusi v. Jacobsen,* supra, after taking notice of the fact that an easement is an interest in land, said:

"It, therefore, follows that there can be no extinguishment of the easement by parol agreement, unless it has been so acted upon by the parties as to remove the bar of the statute."

The plaintiffs make no claim that any agreement of the kind just noted was ever effected by the parties. *Allen v. Neff,* 102 W Va 230, 135 SE 50, 50 ALR 1293, in words which we are about to quote, adverted to a principle which is also employed in this state:

"It is settled law in this state that one cannot lose vested title to land by oral admission that it is the property of another."

See, also, 50 Am Jur, Easements, § 140, p 1025.

■ Neither the execution of deed K by Powers and his family nor its acceptance by the defendant extinguished any easement which the defendant possessed. The only effect of the document was to reduce to writing a description of the course of the easement so that it could be made a matter of public record.

■ Ancillary to the contention, which we have just rejected, that the defendant's acceptance of deed K limited the defendant to an easement to build, maintain and use the railroad, the plaintiffs introduced in evidence the three documents, identified as Exhibits N, O and P, which are summarized in preceding paragraphs of this opinion. They argue that those docu-

ments evidenced a practical construction by the parties of their rights as they existed after the defendant's acceptance of deed K. According to the plaintiffs, the practical construction was: after the defendant's acceptance of deed K, the defendant's right in the western section of plaintiffs' land was limited to the roadbed upon which it had built the railroad. Since we have rejected the plaintiffs' contention that the defendant's acceptance of deed K reduced the defendant's easement to the one upon which the railroad roadbed lay, the premise for this subservient contention is lacking. Nevertheless, we have carefully considered Exhibits N, O and P. We are not persuaded that the parties, by signing them, indicated that the defendant no longer had the right to build upon the plaintiffs' land such facilities as roads, tramways, logging camps and railroad stations. We are prepared to believe that when the parties wrote N, O and P their understanding of their rights was not clear. Possibly the draftsman of N, O and P did not have before him when he wrote those papers such documents as deeds A, B and C. Exhibits N, O and P were concerned, in part at least, with rights and privileges which the defendant had not previously possessed. We have in mind, for example, the rights granted to the defendant by N, O and P (or one of them) to build dams, to take water from the plaintiffs' streams, to occupy two acres of the plaintiffs' property and to purchase 300,000 feet of the plaintiffs' timber. We do not believe that N, O and P indicate that the parties, after the delivery of K, construed the easement which the defendant had reserved to itself by A, B and C as limited to the roadbed of the railroad for railway purposes only. We conclude that the first assignment of error lacks merit.

The second assignment of error charges that the circuit court erred when it held that the defendant had not released and extinguished, through abandonment, any part of its aforementioned easements.

*Bernards v. Link,* 199 Or 579, 248 P2d 341, 263 P2d 794, took notice of the principle of law which governs the termination of easements through non-user and other conduct consisting of manifestations of intent by the grantee to exercise the easement no more. The decision quoted extensively from the authorities.

We will consider later the issue as to whether or not the defendant's substitution of the log truck road for the logging railroad forfeited its easement and will now confine our attention to the issue as to whether or not the defendant has lost, through the alleged "abandonment", its easement over the parts of the railroad right of way in Sections 6, 26, 34 and 4 which were not incorporated in the log truck road. In 1946, as we have shown, the defendant supplanted the part of the railroad which lay in Section 6 with a gravel road which, for virtually its entire length, departed from the rail roadbed. In Section 26 of the log truck road, built in 1949-1950, takes the same course as the railroad did, with the exception of a short piece where the log truck road avoids the collapsed railroad tunnel. In Section 34, where the railroad operated upon long trestles, the log truck road uses only a short part of the railroad right of way, but in Section 4 the log truck road departs from the railroad right of way for a brief distance only.

As our review of the evidence has shown, the railroad has been completely dismantled. Its ties have been burned and its rails, after sale to metal dealers, have been removed from the premises.

Following the work which was done in Section 6, Powers demanded a deed from the defendant conveying to him the 100-foot strip upon which the roadbed of the railroad had lain. His request precipitated an exchange of letters. Those written by the defendant, as we have seen, employed such terms as "the abandoned railroad right-of-way". The defendant's brief in this court says:

> "It seems conclusively established that no part of this right-of-way, either in the westerly or easterly sections, and touching appellants' land, has been abandoned by respondent, unless it can be said that respondent has abandoned its right to construct, maintain and use a railroad where the 'incline' was constructed in Section 6; but we do not mean to suggest thereby that any rights to build logging roads over that area have been abandoned. Respondent does not concede, however, that this segment of right-of-way has been abandoned in any sense. True, the railroad has been removed from the 'incline' segment and from the evidence we think it can be said fairly that this 'incline' will not be rebuilt;  *  *  *."

We think that those words, as well as other evidence, indicate that the defendant does not intend ever again to use the right of way in Section 6 upon which the railroad had operated.

No demand was made by Powers for a conveyance to him of the right of way which the defendant vacated in 1949 and which it did not thereafter use. However, as we have shown, Powers, at about the time the defendant began its program of road building in 1949-1950, demanded of the defendant assurance that abandoned right of way would be returned to him.

We deem it worth while to take notice now of the instruments which created the contested easements.

Most of the land which Powers owns in Section 6 was conveyed by deed C. That instrument, in reserving right of way, employed these terms:

"Saving and excepting therefrom the right of way as now established and occupied by the Salmon Creek Spur of the Logging Department of the Pacific States Lumber Company; also a right of way, and the right at any time to establish and maintain a road or roads, railroad or railroads, tramway or tramways of any kind or character in, over and across said premises without payment or compensation to said second party other than the actual damages to any buildings or structures erected thereon, or growing crops.

"Further excepting and reserving the right to enter upon said land for the transportation and landing of ties, poles, matchwood, logs, lumber and other timber products, the intent of this reservation being to give to the grantor, its successors and assigns, the privilege to use the railroad of said grantor and access to and from the same for the landing, transportation and distribution of its timber products."

Deed B, by which the defendant conveyed some of the land which now constitutes parts of Powers' westerly area, reserved right of way in similar terms to those just quoted. Deed A, by which the defendant conveyed most of the land which constitutes Powers' westerly area, reserved right of way by these provisions:

"Excepting and reserving unto the said parties of the first part a right of way not to exceed one hundred (100) feet in width and the right at any time to establish and maintain a road or roads, railroad or railroads, tramway or tramways * * *; provided that the right of way privileges hereby reserved are to be confined to a hundred (100) foot strip of land through the property herein described * * *; provided, further, that in establishing the

right of way reserved hereunder, * * * and where said right of way shall pass through such bottom land * * * ."

Deed I, which created the easement in the easterly section, employs these terms:

"* * * all that standard gauge logging railroad known as its Salmon Creek Branch, beginning * * *. Also all rights of way and all rights of any and every character owned or held by the first party in connection with the logging railroad hereby conveyed * * * and establishing the following rights of way, to-wit: a right of way one hundred (100) feet in width * * *."

We take the following from the brief which the defendant has submitted:

"As to Appellánts' statement regarding the claim of Respondent to the right to locate a logging road off of the one hundred foot right-of-way, Respondent claims no such right as to the lands described in Exhibit 'A' shown in blue on 'Ex. "M".'

"Respondent admits that it was and is limited to the reservations contained in Exhibit 'A' over the area marked in blue on Exhibit 'M', and to such other locations as appellants permitted it to use for the location of a log trucking road over lands described in Exhibit 'A'."

■ We think that the above reservation clauses created a single right of way, 100 feet wide, which the defendant could use for a railroad right of way or a vehicular road according to its own choice, but we do not believe that the defendant was at liberty at the same time to cross the conveyed land with more than one right of way having a total width in excess of 100 feet.

■■ The difference between the alleged abandonment in Section 6 and that in Sections 4, 26 and 34 is

in the element of time, for, as will be recalled, the railroad roadbed in Section 6 was vacated in 1946, whereas that in the other three sections did not occur until 1949. However, as this court said in *Bitney v. Grim,* 73 Or 257, 144 P 490, through quotation:

> " 'Time is not an essential element of abandonment. The moment the intention to abandon and the relinquishment of possession unite, the abandonment is complete.' "

Non-user alone does not suffice to extinguish an easement: *Hoffman v. Dorris,* 83 Or 625, 163 P. 972. The owner of a servient estate, who seeks to rid the latter of an easement through a claim of abandonment, must prove, not only non-user, but also that it was the intention of the grantee of the easement to make no further use of it. We take the following from *Dean v. Colt,* 160 Or 342, 84 P2d 481:

> "The purpose of this suit is to declare a forfeiture of the easement across plaintiff's property. 'The courts are not inclined to favor forfeitures of easements unless the intent to abandon them plainly appears.' Barton v. Jarvis, 218 Ky. 239 (291 S. W. 38) ; Willard v. Stone, 253 Mass. 555 (149 N. E. 681) ; Arlington Realty Co. v. Keller, 105 N. J. Eq. 196 (147 Atl. 437)."

The more dependable proof of intent is generally found in the party's conduct than in his self-serving declarations. It appears clear that the defendant has no further need for the old right of way in Section 6 and that it has no intention of ever again using it. Both non-user and intention never again to use have been established for that part of the easement upon which the rail roadbed had lain. It is our belief that the defendant has abandoned the parts of the railroad right of way in Section 6 which it has not

incorporated in the gravel road, and that the easement in those parts has ended.

■ Photographs which show parts of the non-used segments of the old railroad right of way in Sections 4, 26 and 34 indicate that they lie unused, unfenced, and available for Powers' use. It is plain that the defendant intends never again to resort to the tunnel. The trestles are decayed, dilapidated and incapable of any service. We feel certain that the defendant intends never again to use them. The bottom land upon which they stand has been discarded by the defendant in favor of the higher ground a few hundred feet distant. When the defendant's officials, after conferring with Powers, decided that the new road should depart from the old railroad right of way in Sections 4, 26 and 34 to the newly selected ground they thereby evidenced an intention, according to our view, not to employ again the course of the former easement. Smith freely conceded that the defendant does not intend to employ both a log truck road and also a logging railroad. If a logging railroad is again constructed, it will use as its roadbed the log truck road and not the course of the former railroad. In the manner above indicated, non-user and intention never again to use were established: *Bitney v. Grim,* supra; *Mammoth Cave National Park Association v. State Highway Commission,* 261 Ky 769, 88 SW2d 931; *City of Herrodsburg v. Cunningham,* 299 Ky 193, 184 SW2d 357; and *Scott v. Black,* 95 W Va 48, 120 SE 167. The decree of the circuit court erred when it failed to hold that the easements for the old railroad right of way which had not been incorporated in the route of the log truck road were terminated.

The plaintiffs further claim that the easements held by the defendant did not authorize it to substitute the

log truck road for the logging railroad. As we have seen, deeds A, B and C, which conveyed the westerly section of the plaintiffs' lands, reserved to the defendant right of way for roads and tramways as well as for a railroad. Deed I, as a quotation from it in a preceding paragraph shows, contains this language:

"* * * Also all rights of way and all rights of any and every character owned or held by the first party in connection with the logging railroad hereby conveyed or any extension thereof or relocations thereof * * * and especially the following rights of way, to-wit: A right of way one hundred (100') feet in width, extending fifty (50') feet on each side of the center line of the tract as at present laid out and above described across all land now owned by the first party, to-wit: * * *."

The provisions of deeds A, B and C which authorized the defendant to construct "a road or roads * * *, tramway or tramways" clearly empowered it to substitute the log truck road for the logging railroad in the westerly section. The language just quoted from deed I (easterly section) warrants a similar conclusion as to the easterly section.

■ The record indicates that the log truck road, as contrasted with the logging railroad, will impose upon the servient estate no additional servitudes or burdens of a substantial nature. Based upon *Bernards v. Link,* supra, we hold that the defendant was warranted by the terms of the easement in converting the logging railroad into a log truck road. Its action in so doing did not forfeit the easement.

Except as to Sections 4, 6, 26 and 34, we find no merit in the second assignment of error.

The third assignment of error follows:

"The Court erred in adjudging that respondent is the owner in fee of the railroad right of way ex-

tending over and across the easterly section of appellants' lands.''

By returning to a preceding paragraph of this opinion, it will be seen that the defendant, as grantor, executed a deed (I) on January 17, 1929, which conveyed to the Port Orford Cedar Products Company most of the defendant's properties, including the right of way in the easterly section. The deed, which denominated the defendant as the first party, said:

"* * * the first party has granted, bargained, sold, assigned, transferred and set over and does hereby grant, bargain, sell, assign, transfer, set over and convey unto the second party all that Standard Gauge Logging Railroad''

At that point the course of the railroad right of way was described. The deed continued:

"all other property, real, personal or mixed, directly appurtenant to said Salmon Creek Branch of said railroad * * *. Also all rights of way and all rights of any and every character owned or held by the first party in connection with the logging railroad hereby conveyed or any extension thereof or relocations thereof or logging spurs in connection therewith and especially the following rights of way, to-wit: A right of way one hundred (100') feet in width, extending fifty (50') feet on each side of the center line of the tract as at present laid out and above described across all lands now owned by the first party * * *.''

When that deed was executed, the defendant owned all of the land which the parties term the easterly section of plaintiff's property.

■ The paragraph of the decree which was concerned with the part of the right of way across the easterly section of plaintiffs' property held that the defendant possessed the fee in the right of way. When

the decree was entered, the decision of this court in *Bernards v. Link,* supra, had not been announced. We think that our holding in that case demands a conclusion that the deed from which we just quoted granted to the Port Orford Cedar Products Company nothing more than an easement. It did not convey the fee.

January 2, 1930, the defendant conveyed to Powers the area which the parties term the easterly. The conveyance was made by a bargain-and-sale deed (Exhibit H) which contained no reservation of the right of way and no warranties of title. The plaintiffs freely concede that when they accepted the deed they were familiar with the railroad, the right of way and the fact that the railroad, together with its right of way, was owned by the Port Orford Cedar Products Company. They also knew that the Port Orford Cedar Products Company was at that time the owner of the Sixes timber and that the railroad was the most feasible way of bringing the timber to market.

The principal contention which the plaintiffs advance under this assignment of error is the following:

"If on January 2, 1930 when respondent conveyed the easterly section lands to appellants by bargain and sale deed, without any reservation or exception of the right of way of the Salmon Creek Branch Railroad, which was then owned by a third party, namely, Port Orford Cedar Products Company, and if thereafter, respondent acquired title to this railroad right of way, the bargain and sale deed mentioned would operate to vest such after-acquired title in the right of way in appellants."

The plaintiffs' use of the phrase "if thereafter, respondent acquired title to this railroad" refers to April 14, 1945, when the defendant and the Port Orford Cedar Products Company merged. The plaintiffs depend up-

on the doctrine of estoppel to sustain the contention now under consideration.

As we have seen from the testimony of Powers and from the declarations made in the plaintiffs' brief, the plaintiffs did not expect to acquire the railroad and its right of way when the defendant delivered to Powers the deed known as H. The latter, which conveyed to Powers the easterly part of his holdings, did not exclude from its compass the right of way, although the defendant, as Powers fully knew, did not then own it. Albeit the plaintiffs never bargained for the right of way, and did not expect to receive it, yet since the defendant reacquired the right of way upon its merger with the Port Orford Cedar Products Company, the plaintiffs now invoke the doctrine of estoppel by deed and depend upon it to gain for them a valuable property which their expectations had never envisioned for them.

A preceding paragraph quotes an admission made by the plaintiffs in their original reply. The statement was under the oath of Powers and over his signature. We will presently quote it in its entirety, but before doing so explain that when it speaks of "the deed" it means the one which we have identified as H, that is, the deed which the defendant executed and delivered to Powers January 2, 1930. Likewise, when the statement speaks of "paragraph V" it refers to the paragraph of the answer which alleged that when deed H was executed and delivered

"it was intended by all of the parties thereto that said one hundred foot (100') right of way and the railroad thereon across said above described lands should be excepted and reserved from said deed; and through mutual mistake of plaintiff, Albert H. Powers, and of the defendant, said deed did not and

does not now truly state the intention of the parties * * * : Said deed as so executed, accepted and recorded, failed to except and reserve said right of way and railroad upon said lands."

Following is the part of the reply which we have in mind:

"Plaintiffs allege that in the execution and delivery of the deed mentioned in said paragraph V by defendant, and the acceptance thereof by plaintiff Albert H. Powers, it was intended by all of the parties that a right of way for the construction, maintenance and operation of a standard gauge railroad over and across the lands mentioned in paragraph IV of defendant's further counter-claim should be accepted [sic] and reserved from said deed but allege that such reservation and exception should be under the terms and conditions set forth in the indenture hereinbefore mentioned, dated January 30, 1929. Plaintiffs further allege that through mutual mistake said deed as executed did not and does not truly state the intention of the parties in that the said obligations, terms and conditions governing defendant with respect to said grant of January 2, 1930, as set forth in the indture of January 30, 1929, are not set forth and incorporated as part of said later deed."

The indenture of January 30, 1929, mentioned in the quoted passage, is the deed to which the record refers as Exhibit K and concerning which the plaintiffs argue that it superseded deeds, A, B and C. We rejected the contention. Thus, it is seen that the quoted language acknowledges that "through mutual mistake" deed H "does not truly state the intentions of the parties" and admits that a mutual mistake occurred when the deed was drafted, signed and accepted. Through that mistake, the deed failed to state, so the reply concedes, that the right of way was excepted from the conveyance. The reply, it will be observed, con-

tends that the mistake went further and, through further error, the deed failed to state that the reservation of the right of way was subject to the provisions of deed K which, as we have seen, undertook to limit the use of the right of way to that of a logging railroad and undertook to provide that if the railroad was abandoned the easement should revert to the dominant estate. The answer which ushered in the issue of mutual mistake does not concede that the mistake included any reference to deed K. Be that as it may, the original reply freely acknowledges that deed H originated in part from a mutual mistake, as a result of which it failed to exempt from its compass the right of way.

The original pleading bore the signature and the verifying oath of Powers. Four months later an amended reply was filed. It, however, was not signed by Powers. It averred:

"Plaintiffs allege that in the execution and delivery of the deed mentioned in paragraph V of defendant's further counterclaim by defendant, and the acceptance thereof by the plaintiff Albert H. Powers, it was expressly intended by the parties to said deed that the right of way of the logging railroad of defendant as then laid out and constructed across Sections * * * should be, and was, accepted [sic] by and reserved to defendant from said deed."

The sections mentioned in the place for which we substituted asterisks are not involved in this suit. Following the quoted language the amended reply averred that the deed of January 2, 1930 (H) was not intended to except any right of way in Townships 31 and 32 South, Range 12 West, Willamette Meridian (involved in this suit). The averment concludes with this:

"Plaintiffs allege that no mistake or omission, either mutual or unilateral, existed at the time of

the execution of the said deed, dated January 2, 1930, and deny that said deed was made and executed other than in exact conformity to the intention of said parties to said deed."

The averment last quoted, which denies mutual mistake, is in conflict with the averment first quoted, which alleges a mistake but contends that it affected property not involved in this suit.

As a witness, Powers made no mention whatever of the reply. Accordingly, he did not deny that he had signed it, verified it and that it bore true testimony to the facts. Since he did not mention the reply, he, obviously, did not claim that, through misapprehension, he had signed it. Inasmuch as he did not dispute its verity, it is our duty to accept the reply as a statement of the truth. That is especially our duty in view of the fact that testimony presented by the defendant shows that the mistake averred in the answer actually occurred. For example, Homer W. Bunker, who was president of the defendant in 1930 when deed H was executed, testified:

"It had no intention to and did not undertake to convey to A. H. Powers, Junior, or anybody else any interest or right or reversion of any kind affecting the Salmon Creek railroad. It was selling the upwards of 11,00 acres of lands already logged or soon to be logged to Powers for 50¢ per acre. The title to the rights-of-way for the Salmon Creek railroad had already been conveyed to the Port Orford Cedar Products Company nearly a year previously by deed of January 17th, 1929, Exhibit B. There were no warranties in the deed to Powers of January 2nd, 1930, and no necessity for any exceptions or reservations with respect to any portion of the properties that had already been conveyed to third parties, especially the Port Orford Cedar Products Company. A. H. Powers, Junior, was fully cog-

nizant of the fact that Coos Bay Lumber Company had no remaining interest of any kind in that railroad or its rights-of-way.''

When the amended reply was filed, the original reply ceased to be a pleading, but it did not cease to bear testimony to the truth. It was received in evidence as an exhibit.

We think it is manifest that deed H does not express the intention of the parties inasmuch as it fails to except from the conveyance the right of way. Its omission so to do was of no moment until the defendant reacquired the right of way and the plaintiffs sought to avail themselves of the doctrine of estoppel by deed. When deed H was drafted, the omission to except from its terms the right of way was a mistake that could readily be committed; at any rate, it was committed. It is certain from the words of Powers himself, above quoted, that a mutual mistake occurred when the defendant, through Bunker, signed deed H and Powers accepted the instrument. Notwithstanding that mistake, the plaintiffs now wish this court to enforce the instrument in their favor, thereby giving them a valuable property which no expectations upon their part had forecast for them.

We deem it unnecessary to review in this decision once more the equitable principles which govern the award of reformation. The principle is so well established that plaintiff's able counsel does not debate it. This is a clear case. A citation to *Spexarth v. Rhode Island Insurance Co.*, 22 Or 118, 245 P 515, suffices. The application of the principles governing reformation are illustrated in *Heltzel v. Baird*, 90 Or 156, 175 P 851, which involved the omission, through mutual mistake, to except an easement. We think that deed H

should be reformed by inserting in it an exception of the right of way. For reasons sufficiently disclosed in preceding paragraphs, we do not believe that the exception of the right of way should be subjected to the terms of deed K.

■ When deed H has been reformed in the manner just ordered, the doctrine of estoppel by deed will avail the plaintiffs nothing. We sustain the third assignment of error in its attack upon the part of the decree which held that the defendant owned the fee in the right of way across the easterly section. The defendant has a grant of an easement, but not the fee. In all other respects the third assignment of error is devoid of merit.

The fourth assignment of error charges:

"The Court erred in adjudging that respondent, since April 14, 1945, has had, and now has, the right to construct, maintain, and use a logging truck road upon and along the four sections of land traversed by the right of way described in the decree as the Easterly section." (Sections 4, 9, 34 and 26)

In support of that assignment of error, appellants' brief says:

"Except for such right, if any, that respondent acquired from appellants under the doctrine of irrevocable license, respondent never had, nor has, any right to use or occupy any lands of appellants in the Easterly section comprising Sections 4, 9, 34 and 26."

We will postpone until we reach the sixth assignment of error a consideration of the defendant's contention that it was granted an irrevocable parol license to build the log truck road.

In arguing in behalf of this assignment of error, the plaintiffs again take to task the paragraph of the chal-

lenged decree which holds that the defendant is "the owner in fee" of a right of way across the easterly section. In disposing of the third assignment of error, we expressed our belief that deed I granted only an easement for the right of way. It did not convey the fee. The plaintiffs next argue in support of this assignment of error that since deed H, which Powers received from the defendant, did not mention the right of way, the doctrine of estoppel by deed won for Powers the right of way and its railroad when the defendant later, through merger with the Port Orford Cedar Products Company (grantee of the right of way), came into ownership of the easement. Our disposition of the third assignment of error resolved that issue adversly to the plaintiffs.

The above, we believe, disposes of the contentions which the plaintiffs advance in support of the fourth assignment of error, with the exception of their argument adverse to the alleged irrevocable parol license.

The fifth assignment of error reads:

"The Court erred in decreeing and adjudging that respondent had and has the right to construct, maintain and use a log trucking road as now constructed, or at all, across the SW ¼ of Section 31, Township 31 South, Range 12 West of the Willamette Meridian as described in paragraph III of the trial court's decree."

The plaintiffs' brief argues:

"Respondent has never had any right to build, construct, maintain or use any truck road or any facility other than a standard gauge railroad over and across the SW ¼ of Section 31."

As support for that contention, the plaintiffs quote the part of deed K, of which a previous paragraph of this

opinion took notice and which granted "a right-of-way * * * for the extension of said railroad from its present terminus across the lands above described in Section 31." We have rejected the contention that deed K superseded deeds A, B and C. Deed A, which conveyed to Powers' mother the SW ¼ of Section 31, reserved right of way for "a road or roads, railroad or railroads, tramway or tramways of any kind or character". Powers is the grantee of his mother and accepted his deed from her with notice of that reservation.

The fifth assignment of error is without merit.

The sixth assignment of error challenges the parts of the decree which hold that the defendant's construction and use of the log truck road was warranted, not only by the easements which the decree recognized as valid, but also by an irrevocable parol license which the decree found the plaintiffs granted to the defendant before it built the road. The decree reads as follows:

"That in addition to the defendant's right * * * the plaintiffs prior to the construction of its trucking road, as now laid out and constructed, extending from the town of Powers, Oregon, to the West line of Section 31 * * *, granted and gave to defendant a parol license to construct, maintain and use said trucking road as now constructed and laid out upon and across lands of plaintiffs upon which said trucking road or any part thereof is located. That the defendant relied upon said consent and license of plainitffs and constructed said trucking road at great expense to defendant. That said parol license is irrevocable; and that the plaintiffs and all persons claiming under them be and are estopped to allege or claim that defendant was or is without right to construct, maintain and use said log trucking road as it is laid out and constructed upon and across any lands of plaintiffs; and plaintiffs and all persons claiming under them be and are per-

petually restrained and enjoined from interfering with defendant in its exercise and use of said license.''

Next the decree, in language similar to the foregoing holds that the plaintiffs granted the defendant an irrevocable parol license to construct the log trucking road over the courses which we have termed deviations, or detours, from the former railroad right of way. This part declares that the plaintiffs granted the defendant

"an irrevocable parol license to construct the same on lands of plaintiffs adjacent to the 100 foot strip of land upon plaintiffs' properties as described in paragraphs 1, 2 and 3 above of this decree, which deviations from said 100 foot strip of land so used by the defendant pursuant to the said irrevocable parol license are located in Sections 26 and 34, Township 31 South, Range 12 West of the Willamette Meridian and in Sections 4 and 6 in Township 32 South, Range 12 West of the Willamette Meridian; and that the plaintiffs be and are estopped in claiming that defendant had no right to construct said road where it is now constructed and located on the lands of plaintiffs lying adjacent to said 100 foot strip of land; * * *.''

Before contesting the facts and legal principles upon which the circuit court rested its findings that plaintiffs granted the defendant the irrevocable parol license, the plaintiffs advance an issue which is possibly not included within the ambit of this assignment of error, but which we will nevertheless now consider. They claim that the decree, the pertinent part of which we quoted, does not describe sufficiently the deviations. They do not claim that the decree fails to describe adequately the course of the easement employed by the railroad right of way.

It is true, as the plaintiffs contend, that

a judgment or decree which affects the title to real property must describe it with sufficient certainty to identify it: 49 CJS, Judgments, § 80, p. 203. The provision of the decree which is under attack, after mentioning Sections 4, 6, 26 and 34, says: "said road where it is now constructed and located on the lands of plaintiffs lying adjacent to said 100 foot strip of land". Thus the land affected by the part of the decree under challenge was described in a manner which should enable anyone to identify it.

In *O'Connor v. Baum*, 54 Ind App 195, 100 NE 581, the description of land which was under attack read as follows:

"* * * except the right of way for the said millrace passing through said land where it now is, and as reserved in a certain deed executed by Samuel Milroy et el. to George W. Baum, which deed is recorded in Record 24, page 32, of the Deed Records of Carroll County, Indiana."

In sustaining the sufficiency of the description, the court, for obvious reasons, ignored the reference to the deed records; it said:

"* * * The rule is that a description of lands is sufficient in a judgment in ejectment, or quieting title if, by the aid of a competent surveyor and persons knowing the location of monuments mentioned as points in the boundaries, the lands can be found. * * * In Pence v. Armstrong, 95 Ind. 191, a right of way of a railroad is held a visible monument. From the description under consideration the sheriff assisted by a qualified surveyor could very readily locate the lands and the right of way which is excepted in the description of the lands owned by appellees. The millrace is a water course or canal, it has a well-defined channel and banks, is a fixed and determined object within the limits of the land described, and there would be no

difficulty in tracing such water course, and in fixing the channel and banks. We hold the description of the exception sufficient * * *."

We believe that the same observations could properly be made about the log truck road.

In *Bogard v. Barhan,* 52 Or 121, 96 P 673, it is said:

"* * * The rule for determining the sufficiency of a description in a deed or any other writing in relation to real property is: Can a surveyor, with a deed or other instrument before him, with or without the aid of extrinsic evidence, locate the land and establish the boundaries? * * *"

In *Hamilton v. Rudeen,* 112 Or 268, 224 P 92, the court said:

"* * * The description in a deed of land conveyed must be sufficiently definite and certain to enable the land to be identified or to furnish the means of identifying the land under the maxim, *Id certum est quod certum reddi potest* * * *."

We are satisfied that the challenged description is sufficient.

■ This court has many times employed the principle first enunciated in *Rerick v. Kern,* 14 S and R 267, 16 Am Dec 497, that a license becomes irrevocable and in the nature of an easement after expenditures by the licensee, in reliance thereon and in consummation of the purpose for which the license was given. In *Heisley v. Eastman,* 102 Or 137, 201 P 872, Mr. Justice HARRIS followed his analysis of our earlier decisions upon the subject of irrevocable parol license with a statement of the governing principle which has been accepted ever since. Appellants' brief, referring to *Heisley v. Eastman,* says:

"despite its patent unsavoriness to us, seems now to

state the rule prevailing in this state in so far as it goes and, of course, subject to the limitations expressed therein. Because we apprehend that the language of this case is, as we have said, the present law in Oregon, we will quote that portion of the Court's opinion stating the rule of the case.''

Then follows this quotation:

''* * * After an examination of our own precedents and a consideration of the conclusions announced in them and after an analysis of the reasons assigned for those conclusions, it is our view that neither the direct payment of a consideration nor the accrual of a benefit to the licensor is a *sine qua non,* although these elements when present either singly or in combination may strengthen the right of a licensee to invoke the aid of a court of equity to prevent the perpetration of a fraud upon him. An oral and gratuitous permission when acted upon by the expenditure of a considerable sum of money in the construction of valuable improvements, which have been made on the faith of such permission and would not have been made in the absence of such permission and would be either destroyed or materially lessened in value by a revocation of such permission presents a situation making the doctrine of equitable estoppel peculiarly applicable, especially when the limits of that doctrine are measured by the reasoning employed in our own precedents upon the subject of oral licenses; and this conclusion is in harmony with the views expressed by some other courts: Rerick v. Kern, 14 Serg. & R. (Pa.) 267 (16 Am. Dec. 497); Stoner v. Zucker, 148 Cal. 516 (83 Pac. 808, 113 Am. St. Rep. 301, 7 Ann. Cas. 706); 1 Williston on Contracts, 311; 17 R. C. L. 576, 579. In the instant case the plaintiffs made valuable and extensive improvements on the faith of the permission granted by Brown, and if such permission so acted upon is revoked the value of the improvements will be materially impaired. The plaintiffs now have a license amounting in sub-

stance to an easement which is revocable only if the plaintiffs refuse to comply with the condition imposed on them by Brown.''

■ Our latest application of the rule of irrevocable parol license was in *Shepard v. Purvine*, 196 Or 348, 248 P2d 352, by Mr. Justice Tooze, in which we held that the plaintiffs were entitled to a permanent right of way across the defendants' land for a pipe line whereby they had for many years transmitted water to their land from a spring upon the defendants'. The decision recognized in the plaintiffs the right to take water from the spring. The plaintiffs, in reliance upon the gratuitous license, had installed the pipe line. The defendants admitted that they gave the plaintiffs oral permission to tap the spring and conduct the water to their land, but insisted that the rights which they gave were temporary and revocable. The plaintiffs' version of the transaction indicated that the rights were permanent. The decision said:

"\* \* \* If the agreement was as is contended for by plaintiffs, then plaintiffs have an irrevocable license to use the water and maintain their pipe line across defendants' lands. \* \* \*

"In Baum et ux v. Denn et al, supra, at page 407, this court, speaking through the late Justice Belt, said: 'Having found that there was a parol license for plaintiffs to use the road, it remains to be seen whether such license has become irrevocable by reason of the plaintiffs having made permanent and valuable improvements in reliance thereon. In most jurisdictions a parol license to use land may be revoked by the licensor, as it creates no interest in the land and is not governed by the Statute of Frauds; *but in this state*—in keeping with the minority rule —*such license becomes irrevocable if, in reliance thereon, the licensee makes permanent and valuable improvements.*' (Italics ours)''

The decision concluded:

"All the undisputed circumstances of this case point directly to the fact that plaintiffs' oral license was intended to be, and was and is, permanent. In reliance upon this oral license, plaintiffs made valuable improvements on and in connection with their lands and in laying the pipe line. It would be wholly inequitable and unjust to now permit defendants to destroy plaintiffs' rights. Defendants, under all the facts and circumstances of this case, ought to be, and they are, estopped to deny plaintiffs' claims. Plaintiffs' license to a use of a portion of the water from the spring in question and to maintain their pipe line across the lands of defendants is irrevocable."

Such is the principle which governs the issue now under consideration.

We have reviewed at length the evidence which shows whether or not the plaintiffs granted to the defendant an irrevocable parol license to build the present log truck road. The road was built in two periods; the first was the year 1946; the second in 1949-1950.

We think it is clear that before the defendant undertook any work in Section 6 its officials met with Powers in that section and, after showing him what the defendant proposed to do, received Powers' acquiescence in these words, "go ahead". It is clear that he was pleased with the defendant's proposed construction work which included the dismantling of the logging railroad and the construction of a good gravel road. Based upon Powers' assurances that he viewed the defendant's rights in the same manner as it viewed them and that he approved the construction program which the defendant's officials had explained to him, the defendant performed the work and made its expenditures.

Such were the circumstances which governed the work done in 1946.

We have described at length by resort to quotation from the testimony the conferences which preceded the work which was done in 1949 and the additional work done in 1950. As will be recalled, Smith, who was the principal negotiator for the defendant, gave a detailed account of the several conferences which he had with Powers. He specified the places where the meetings occurred and reported the subject matter which was discussed. He quoted, to the extent that he was able, the words which were spoken. When Powers later mounted the witness stand and undertook to meet the testimony that Smith had given, he virtually confined himself to the single word "no". He did not deny that the conferences had occurred and that the subject matters had been discussed which Smith had mentioned, but denied, through the use of the single word "no" that he had authorized the construction of a log truck road. His denial was not narrative, but the expression of a conclusion.

Smith, in giving his testimony, swore that he inquired carefully of Powers as to whether the latter claimed that the defendant's title instruments did not authorize it to construct the log truck road and make deviations from the present right of way wherever necessary. According to him, Powers replied that the deeds authorized the defendant to alter the existing right of way, but required the defendant to pay for any damage to Powers' crops and buildings. It seems clear that Smith's purpose in conferring with Powers was to determine whether or not he interpreted the rights of the parties in the same manner as the defendant. The men apparently were friends and the relationship be-

tween the defendant and Powers was an amicable one of long standing. It seems reasonable to believe that after the defendant and Powers had enjoyed good relations for many years that the defendant would consult him before entering upon an extensive construction program which would affect his interests. The circumstances commend Smith's description of the conferences and their subject matter as natural and reasonable. When Smith sought out Powers and asked him for his version of the rights of the parties, he must have known that the defendant would attach importance to the answers which Smith was seeking.

If the defendant had sought from Powers nothing except the privilege of building a narrow road for the accommodation of Powers and incidental use by the defendant, Smith and Powers would not have been required to resort to a succession of conferences. If the purpose of Smith in calling upon Powers had been merely to ascertain whether he had any objection to a road to be constructed principally for Powers' use, there would have been little to discuss, especially after Powers had quickly acquiesced in Smith's proposal to build the diversions in lieu of incorporating into the new road the tunnel and trestles. Surely, when Powers heard Smith narrate plans for a two-lane thoroughfare, rocked to a width of twenty-five feet, he must have realized that the defendant intended to build a road for something other than Powers' accommodation.

The brief submitted by the appellants' counsel says:

"As to all of the crucial matters alluded to, either directly or by inference, in Mr. Smith's testimony, Mr. Powers categorically denies the same. We deem it unnecessary to analyze any such conflicts in testimony with particularity. In weighing any such conflicts, however, we apprehend that it

> is the duty of the appellate court to weigh all of the factors bearing upon the resolution of such a problem.''

Plainly, it is our duty to weigh the conflicts and seek to find the truth. But when an appellate court is engaged in such a quest for the truth, a party to the appeal will be at a disadvantage if he elected in the trial court to confine himself to ''no'' after the other side had given a detailed account of several conferences in which the parties had admittedly engaged before they reached their understanding. There is nothing improbable about Smith's testimony. So far as we can ascertain, he was attempting to speak the truth. Seemingly, he was frank and careful about his utterances. We know of no reason why the detailed account which he gave should be effected by Powers' single word ''no''. At first it might seem that since the parties have several times previously placed their agreements in writing, they should have done so in this instance. However, in this instance, according to Smith, the parties were in accord and viewed their previous agreements in like manner. That being so, there was no need for more written instruments. See, by the way of comparison, *Shepard v. Purvine,* supra.

It is our belief that Smith fully acquainted Powers with the defendant's plans and that Powers, after understanding what the defendant proposed to do, told Smith that the defendant had a lawful right to engage in the new project, subject only to liability for expenses if it destroyed his crops or buildings. We also believe that Powers told Smith that the defendant should proceed with its work and that he had no objections thereto. We think that Powers gave his consent before the defendant had made any expenditures in road building.

It is true that before the conferences occurred between Smith and Powers in 1949 at the Bigelow ranch, Cline's crew had been engaged for three or four days in dismantling the railroad, but the defendant does not seek to show that Powers consented to that phase of its work. Its purpose was to show that Powers consented to the making of the diversions. No work upon them had been done at the time of the 1949 meeting at the Bigelow ranch. We believe that the defendant, in good faith, made its expenditures and performed its work in reliance upon Powers' assurances. We also believe that it would not have performed its work and spent its money had the assurances not been given. If the consent then given is now revocable, the defendant will sustain a very heavy loss.

The appellants' brief argues that the defendant's expenditures for road construction were not made in reliance upon anything which Powers had said, but because the defendant was under a contractual duty to build a road for Powers. The plaintiffs contend that the road which the defendant built in 1946 in Section 6 was built as a result of the demands of agreement N. A preceding paragraph expresses a belief adverse to that contention. We remain satisfied with the conclusion there stated. Next, the appellants' brief argues that the road building which the defendant performed in the easterly section should be attributed to the demands of agreement L. When the tunnel became useless, the defendant's officials felt that they owed a duty to provide Powers with a means of travel, and they thereupon conferred with him. But we do not believe that the road was built as a result of agreement L. It is our belief that the road was built because the defendant itself wanted an adequate road leading into

its Sixes timber. The fact that the road would also serve Powers' need was, no doubt, deemed a fortuitous circumstance, but it was not the real cause which led to the construction of the log truck road which we have described.

The conclusion is inescapable that Smith gave a truthful account of his conferences with Powers. In so expressing ourselves, we cast no unfavorable reflections upon Powers' veracity. He never attempted to describe the conferences in which he and Smith had engaged. His single word "no" amounts to nothing more than an inference drawn by him as to the legal results achieved in the course of the conferences. Thus, Smith's account of the conferences is, in effect, uncontradicted.

We believe that the circuit court did not err when it held that the plaintiffs granted the defendant an irrevocable parol license to build and use a log truck road. We dismiss this assignment of error as lacking in merit.

The seventh assignment of error follows:

"The trial court erred in dismissing appellants' action for damages in trespass and for an injunction against the continuing trespass of respondent."

From the views above stated, it necessarily follows that we reject that assignment of error.

The eighth assignment of error, which is lengthy, attacks the award of damages. The amount, it will be recalled, is $547.10. The defendant did not cross-appeal. If any error was made in the award of damages, the error was favorable to the plaintiffs. There is no merit in this assignment of error.

The ninth assignment of error attacks a ruling made by the trial court when it sustained objections made by

the defendant to two documents tendered by the plaintiffs. When the tender was made, the court had already announced its decision, but was receiving testimony for the limited purpose of determining the amount of damages to which the plaintiffs were entitled for injury to crops and buildings. The two documents had no bearing upon that issue. We do not believe that this assignment of error discloses any merit.

The above disposes of all assignments of error. We have sustained the appellants in part. The cause is remanded for the necessary revision in the decree. When the decree is redrafted, in harmony with the above directions, there should be incorporated in it a description of the deviations from the former logging railroad right of way.